[Cite as *Buckeye Firearms Found., Inc. v. Cincinnati*, 2020-Ohio-5422.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| BUCKEYE FIREARMS FOUNDATION INC., | : | APPEAL NO. C-190569 |
| | | TRIAL NO. A-1803098 |
| OHIOANS FOR CONCEALED CARRY, | : | |
| and | : | *O P I N I O N.* |
| JORDAN TELTING, | : | |
| Plaintiffs-Appellees, | : | |
| vs. | : | |
| CITY OF CINCINNATI, OHIO, | : | |
| and | : | |
| PAULA BOGGS MUETHING, in her official capacity as city solicitor, | : | |
| Defendants-Appellants. | : | |

Civil Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: November 25, 2020

*James P. Sean Maloney*, *Ronald Lemieux*, and *Haynes Kessler Myers & Postalakis, Inc.*, *David S. Kessler* and *Stephen P. Postalakis*, for Plaintiffs-Appellees,

*Paula Boggs Muething*, City Solicitor, and *Emily Smart Woerner*, Chief Counsel - Litigation, for Defendants-Appellants.

**WINKLER, Judge.**

{¶1} The issue presented in this appeal is whether the city of Cincinnati exceeded its home-rule authority by enacting a municipal ordinance banning the possession and transfer of firearm "trigger activators." Because the ordinance conflicts with a state law governing an individual's rights to ownership and possession of firearms, we determine that the municipal ordinance is an invalid exercise of home-rule authority. We affirm the judgment of the trial court.

## Background and Procedure

{¶2} In May 2018, Cincinnati City Council adopted an emergency ordinance banning "trigger activators" within the city ("Ordinance 91-2018"). Ordinance 91-2018 defines "trigger activators" as "a device designed or functioning to accelerate the rate of fire of a firearm to approximate an automatic weapon, including bump stocks, trigger cranks, slide fire devices, and other similar accessories." Any person who unlawfully owns, possesses, sells, or uses a trigger activator within the city would be guilty of a first-degree misdemeanor.

{¶3} Shortly after the passage of Ordinance 91-2018, plaintiffs-appellees Buckeye Firearms Foundation, Inc., ("Buckeye Firearms") Ohioans for Concealed Carry, and Jordan Telting (collectively the "Firearm Plaintiffs") sent a letter to the city demanding that it take action to invalidate or enjoin the enforcement of Ordinance 91-2018. The Firearm Plaintiffs contended that Ordinance 91-2018 conflicted with R.C. 9.68, a state statute recognizing an individual's right to possess firearms and their components in accordance with state and federal law. The city declined to take action, and the Firearm Plaintiffs filed the instant lawsuit against defendants-appellants the city of Cincinnati and former city solicitor Paula Boggs Muething (collectively "the city") seeking a declaratory judgment that Ordinance 91-

2018 conflicted with state law and an injunction against any enforcement of Ordinance 91-2018 by the city.

{¶4}  After an evidentiary hearing, the trial court granted a preliminary injunction in favor of the Firearm Plaintiffs.  The parties exchanged discovery, including deposing expert witnesses, and the parties then filed cross-motions for summary judgment.

{¶5}  In their motion for summary judgment, the Firearm Plaintiffs introduced evidence as to the effect of Ordinance 91-2018.  Buckeye Firearms introduced deposition testimony and affidavits from its corporate representative, its president and board member, and a volunteer website manager.  The evidence showed that Buckeye Firearms engages in activities that advance the rights of gun owners throughout Ohio, including educational activities like school-security programs.  Buckeye Firearms also hosts and operates an annual fundraising event called the Buckeye Bash, during which Buckeye Firearms raffles firearms and ammunition as prizes.  In connection with the Buckeye Bash, Buckeye Firearms stores and transfers firearms and ammunition.  Buckeye Firearms argued that Ordinance 91-2018 negatively impacted its ability to raffle firearms to people in Cincinnati.

{¶6}  Similar to Buckeye Firearms, Ohioans for Concealed Carry is also a nonprofit corporation that engages in various activities to advance gun rights, including legislation, litigation, educational grants, and fundraising.  Finally, Telting testified that he works as a security guard in Cincinnati, and that he also owns a "trigger activator," namely a binary trigger.  As a result of Ordinance 91-2018, Telting must store his binary trigger outside city limits.

{¶7} The Firearm Plaintiffs also introduced testimony from Jeff Steley, a firearms expert, who explained that "trigger activators" are integral parts of a firearm, because they affect the function of the firearm. Steley explained that trigger activators are devices installed on firearms, such as the Armalite rifle system. According to Steley, the Armalite rifle system has a modular design allowing the consumer to replace or customize rifle parts, such as stocks and trigger mechanisms. Steley also testified that consumers can have firearms custom built with trigger activators. For instance, a consumer could have a firearm custom built with a binary trigger as a "drop-in" trigger mechanism, where the binary trigger is the only trigger, without which the firearm would not operate. Based on Steley's testimony, the Firearm Plaintiffs argued that "trigger activators" can be "components," and thus Ordinance 91-2018 conflicts with R.C. 9.68.

{¶8} The city also introduced its own firearms expert, James Yurgealitis. Yurgealitis testified as a former federal agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives. Yurgealitis explained that trigger activators are generally "aftermarket" accessories to firearms that change the rate of performance of a firearm from how it was originally manufactured. Yurgealitis admitted, however, that certain firearms are manufactured with trigger activators.

{¶9} The trial court ultimately granted summary judgment in favor of the Firearm Plaintiffs and held that Ordinance 91-2018 conflicted with R.C. 9.68, and thus the city exceeded its home-rule powers. The trial court also granted the Firearm Plaintiffs' motion for attorney fees and costs. This appeal by the city ensued.

**Buckeye Firearms' Standing to Bring the Action**

{¶10} In its first assignment of error, the city argues that the trial court erred in granting summary judgment in favor of Buckeye Firearms because Buckeye Firearms lacks standing.

{¶11} In order for a trial court to have jurisdiction over an action, the matter must be justiciable, and "[a] matter is justiciable only if the complaining party has standing to sue." *ProgressOhio.org, Inc. v. JobsOhio*, 139 Ohio St.3d 520, 2014-Ohio-2382, 13 N.E.3d 1101, ¶ 11, citing *Fed. Home Loan Mtge. Corp. v. Schwartzwald*, 134 Ohio St.3d 13, 2012-Ohio-5017, 979 N.E.2d 1214, ¶ 41. Standing to bring a lawsuit requires litigants to show that "they have suffered '(1) an injury that is (2) fairly traceable to the defendant's allegedly unlawful conduct, and (3) likely to be redressed by the requested relief.' " *ProgressOhio.org* at ¶ 7, quoting *Moore v. Middletown*, 133 Ohio St.3d 55, 2012-Ohio-3897, 975 N.E.2d 977, ¶ 22. Standing is "an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

{¶12} In their amended complaint, the Firearm Plaintiffs brought two causes of action: (1) a taxpayer action under R.C. 733.59 and a request for injunctive relief under R.C. Chapter 2727, and (2) declaratory relief under R.C. Chapter 2721 and R.C. 9.68.

{¶13} The city argues that Buckeye Firearms lacks standing in the taxpayer action filed under R.C. 733.59 because Buckeye Firearms is a nonprofit association

and not a taxpayer. The Firearm Plaintiffs do not allege that Buckeye Firearms is a plaintiff in the statutory taxpayer action. They allege in their amended complaint that Telting is a resident and taxpayer of the city, and that he made a written demand to the city under the taxpayer statute. Thus, Buckeye Firearms was not a plaintiff in the taxpayer action, and we need not determine whether it had standing to bring that claim.

{¶14} The city also argues that Buckeye Firearms lacks standing under R.C. Chapter 2721, Ohio's Declaratory Judgment Act, and R.C. 9.68. Firearm Plaintiffs allege in their amended complaint that Buckeye Firearms brings its action on behalf of its members. "[A]n association has standing on behalf of its members when '(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.' " *Ohio Contrs. Assn. v. Bicking*, 71 Ohio St.3d 318, 320, 643 N.E.2d 1088 (1994), quoting *Hunt v. Washington State Apple Advertising Comm.*, 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977).

{¶15} According to the city, Buckeye Firearms does not meet the test for associational standing because it does not keep a membership list, it does not require membership dues, and its executive director testified that he considers all Ohio gun owners to be members of the organization. The city does not point to any authority requiring an association to have paid membership or official membership lists in order to establish standing to sue. Moreover, the record demonstrates that although Buckeye Firearms does not keep an official list of members, it does have an email listserv and sends electronic newsletters to those on the listserv. The record also indicates that Buckeye Firearms has an executive director and board members, as

well as a website manager. Thus, Buckeye Firearms has demonstrated that it is an association with members.

{¶16} We further determine that Buckeye Firearms has established the three elements required for associational standing. Buckeye Firearms' executive director, its website manager, as well as a third member filed affidavits claiming that they had been negatively impacted by Ordinance 91-2018, because they could not possess trigger activators within Cincinnati. Given the affidavits of Buckeye Firearms' members, Buckeye Firearms meets the first prong of the associational-standing test, which requires that its members would otherwise have standing to sue in their own right. *See Ohio Contrs. Assn.* at 320. The second prong requires that the interests the association seeks to protect are germane to the association's purpose. *Id.* Buckeye Firearms' interests include expanding and preserving gun rights of all gun owners in Ohio, which would be protected by a declaratory judgment invalidating a municipal ordinance limiting gun possession. The third prong for associational standing requires that the claim and the relief requested will not depend upon the participation of individual members in the lawsuit. *Id.* Buckeye Firearms seeks a declaration that Ordinance 91-2018 conflicts with R.C. 9.68, which does not require the participation of individual members. Buckeye Firearms has established the test for associational standing in this declaratory-judgment action.

{¶17} Even if Buckeye Firearms did not meet the associational-standing requirements for bringing a declaratory-judgment action, Buckeye Firearms has established standing to sue in its own right. Ohio's Declaratory Judgment Act permits "any person whose rights, status, or other legal relations" depend upon the validity or construction of a provision, statute, rule, or ordinance to have his or her rights declared. R.C. 2721.03. "Person" as used in the Declaratory Judgment Act

includes a corporation. R.C. 2721.01. Thus, Buckeye Firearms as a nonprofit Ohio corporation would qualify as a "person" entitled to bring an action under the Declaratory Judgment Act.

{¶18} The evidence put forth by Buckeye Firearms during summary judgment demonstrates that Buckeye Firearms as an organization engages in limited firearms trade in connection with an annual fundraiser in which the organization raffles firearms products. According to Buckeye Firearms, Ordinance 91-2018 hinders its ability to trade and fundraise in the Cincinnati area. The evidence shows that Buckeye Firearms has suffered an injury that is traceable to the city's alleged unlawful conduct, and that a declaratory judgment invalidating the ordinance would redress its injury. *See ProgressOhio.org, Inc.,* 139 Ohio St.3d 520, 2014-Ohio-2382, 13 N.E.3d 1101, at ¶ 7. Thus, Buckeye Firearms has standing to sue the city in a declaratory-judgment action.

{¶19} It is worth noting that our sister appellate district recently determined that Buckeye Firearms lacked standing to pursue a declaratory-judgment action against the city of Columbus in a case very similar to the one at bar. *See Ohioans for Concealed Carry v. City of Columbu*s, 2019-Ohio-3105, 140 N.E.3d 1215, ¶ 45 (10th Dist.), *appeal allowed*, *Ohioans for Concealed Carry v. Columbus*, 157 Ohio St.3d 1495, 2019-Ohio-4840, 134 N.E.3d 1210. In the *Columbus* case, the city of Columbus adopted an ordinance banning the possession of firearm accessories that accelerate the rate of fire. Buckeye Firearms, Ohioans for Concealed Carry, and another individual challenged the ordinance and obtained a permanent injunction in the trial court. On appeal, the city argued that the plaintiffs-organizations lacked standing under the Declaratory Judgment Act because they failed to allege that they as organizations or their members suffered an injury as a result of the challenged

8

ordinance. The Tenth Appellate District agreed that Buckeye Firearms lacked standing because it "did not allege the challenged ordinance affected them in particular, as opposed to the general public, either as a result of their current status or due to potential future prosecution." *Id.* at ¶ 45.

{¶20} The deficiency with respect to Buckeye Firearms' standing in the *Columbus* case is not present in this case. Unlike the *Columbus* case where Buckeye Firearms failed to show that it had suffered any harm different from the public at large as a result of the ordinance, here Buckeye Firearms has provided specific evidence that it as well as its members have been negatively impacted by the city's enactment of Ordinance 91-2018, because they cannot engage in trade, fundraising, or travel with their banned firearm parts in the city. Therefore, we determine that the *Columbus* case is distinguishable, and that Buckeye Firearms has established standing to bring the underlying declaratory-judgment action here.

**City Exceeded its Home-Rule Power**

{¶21} The city's first assignment of error also asserts that the trial court erred in determining that the city exceeded its home-rule authority by enacting Ordinance 91-2018.

{¶22} The Home Rule Amendment of the Ohio Constitution allows a municipality such as the city "to exercise all powers of local self-government and to adopt and enforce within their limits such local police, sanitary and other similar regulations, as are not in conflict with general laws." *See* Article XVIII, Section 3, Ohio Constitution. The Ohio Supreme Court has adopted a three-part test to determine whether a municipality has exceeded its powers under the Home Rule Amendment. *See Mendenhall v. Akron*, 117 Ohio St.3d 33, 2008-Ohio-270, 881 N.E.2d 255, ¶ 17. In *Mendenhall*, the court determined that a municipality exceeds

9

its powers under the Home Rule Amendment when "(1) the ordinance is an exercise of the police power, rather than of local self-government, (2) the statute is a general law, and (3) the ordinance is in conflict with the statute." *Id.*, citing *Canton v. State*, 95 Ohio St.3d 149, 2002-Ohio-2005, 766 N.E.2d 963, ¶ 9. When applying the three-part test of *Mendenhall*, a court only considers the third part of the test, whether the ordinance conflicts with state law, if the first and second parts of the test have been satisfied first: the municipality has not exercised a power of self-government and a general state law exists. *Mendenhall* at ¶ 18.

{¶23} We apply the three parts of *Mendenhall* to determine whether the city exceeded its powers under the Home Rule Amendment in enacting Ordinance 91-2018. The trial court held that Ordinance 91-2018 conflicted with the state statute, R.C. 9.68. R.C. 9.68 was recently amended, but the statute in effect at the time of the trial-court proceedings stated in pertinent part:

(A) The individual right to keep and bear arms, being a fundamental individual right that predates the United States Constitution and Ohio Constitution, and being a constitutionally protected right in every part of Ohio, the general assembly finds the need to provide uniform laws throughout the state regulating the ownership, possession, purchase, other acquisition, transport, storage, carrying, sale, or other transfer of firearms, their components, and their ammunition. Except as specifically provided by the United States Constitution, Ohio Constitution, state law, or federal law, a person, without further license, permission, restriction, delay, or process, may own, possess, purchase, sell, transfer, transport, store, or keep any firearm, part of a firearm, its components, and its ammunition.

(B) In addition to any other relief provided, the court shall award costs and reasonable attorney fees to any person, group, or entity that prevails in a challenge to an ordinance, rule, or regulation as being in conflict with this section.

{¶24} The parties agree that the first and second parts of the *Mendenhall* test are satisfied here because Ordinance 91-2018 is an exercise of the city's police power, and R.C. 9.68 is a general law. A general law exists when " 'a matter has become of such general interest that it is necessary to make it subject to statewide control as to require uniform statewide regulation, [and] the municipality can no longer legislate in the field so as to conflict with the state.' " *Mendenhall* at ¶ 12, quoting *State ex rel. McElroy v. Akron*, 173 Ohio St. 189, 194, 181 N.E.2d 26 (1962). In order to be a general law, a state statute must:

'(1) be part of a statewide and comprehensive legislative enactment, (2) apply to all parts of the state alike and operate uniformly throughout the state, (3) set forth police, sanitary, or similar regulations, rather than purport only to grant or limit legislative power of a municipal corporation to set forth police, sanitary or similar regulations, and (4) prescribe a rule of conduct upon citizens generally.'

*Cleveland v. State*, 128 Ohio St.3d 135, 2010-Ohio-6318, 942 N.E.2d 370, ¶ 13, quoting *Canton* at syllabus. The Ohio Supreme Court has already held that R.C. 9.68 meets the general-law test. *See Cleveland* at paragraph one of the syllabus.

{¶25} Therefore, because the first and second parts of the *Mendenhall* test have been satisfied, we can consider the third part of the test as to whether Ordinance 91-2018 conflicts with R.C. 9.68. *See Mendenhall*, 117 Ohio St.3d 33, 2008-Ohio-270, 881 N.E.2d 255, at ¶ 17.

11

{¶26} In determining whether a municipal ordinance conflicts with a general law, the Ohio Supreme Court stated in *Mendenhall* that an ordinance can conflict with a general law directly or indirectly. *Id.* at ¶ 29-31. A direct conflict exists when " '[an] ordinance permits or licenses that which the statute forbids and prohibits, and vice versa.' " *Id.* at ¶ 29, quoting *Am. Fin. Servs. Assn. v. Cleveland*, 112 Ohio St.3d 170, 2006-Ohio-6043, 858 N.E.2d 776, ¶ 40, and *Cincinnati v. Baskin*, 112 Ohio St.3d 279, 2006-Ohio-6422, 859 N.E.2d 514, ¶ 19. This is also known as the "contrary directives" test. *Mendenhall*, 117 Ohio St.3d 33, 2008-Ohio-270, 881 N.E.2d 255, at ¶ 29. An ordinance can also conflict with a general law indirectly, which the court termed "conflict by implication." *Id.* at ¶ 31. A conflict by implication exists when the General Assembly has indicated that the state statute controls the subject exclusively. *Id.* at ¶ 32, citing *Baskin* at ¶ 23.

{¶27} The Ohio Supreme Court declined to find a conflict by implication existed between former R.C. 9.68 and a municipal ordinance prohibiting concealed handguns in city parks. *Ohioans for Concealed Carry, Inc. v. Clyde*, 120 Ohio St.3d 96, 2008-Ohio-4605, 896 N.E.2d 967. The court recognized that although former R.C. 9.68 "embod[ied] the General Assembly's intent to occupy the field of handgun possession in Ohio, that intent 'does not trump the constitutional authority of municipalities to enact legislation pursuant to the Home Rule Amendment, provided that the local legislation is not in conflict with general laws.' " *Id.*, quoting *Am. Fin. Servs. Assn.* at ¶ 31. Therefore, we will apply the contrary-directives test to determine whether Ordinance 91-2018 directly conflicts with R.C. 9.68.

{¶28} R.C. 9.68 makes clear that Ohio citizens have the right to possess and transfer "any firearm, part of a firearm, its components, and its ammunition." Ordinance 91-2018 bans possession and transfer of firearm "trigger activators." The

question in this case is whether "trigger activators" qualify as "components" of a firearm such that Ordinance 91-2018 bans what R.C. 9.68 permits, and the two laws conflict.

{¶29} The city argues that "trigger activators" are secondary accessories or attachments to a firearm, and not "components." The city argues that "components" of a firearm as that term is used in R.C. 9.68 means "original equipment" or "standard equipment." The city relies on Steley's expert testimony where he admitted that trigger activators, such as bump stocks, change the rate of fire compared to a normal, factory-issued stock.

{¶30} Nothing in the text of R.C. 9.68 supports the city's view that firearm components are limited to those parts that are standard or original to the firearm. Nevertheless, even under the city's restrictive definition of firearm "component," the city's argument fails to harmonize R.C. 9.68 and Ordinance 91-2018. The city admits that trigger activators can be included as original equipment on firearms, without which the firearm would not function. Both of the firearm experts testified that some firearms, including custom-made firearms, are produced with trigger activators. Thus, at least with respect to some firearms, trigger activators are not after-market "accessories" or "attachments," and the trigger activators are "components" of the firearm without which the firearm would not function.

{¶31} The dissent would conclude that trigger activators are accessories and not components, because trigger activators are not necessary in order for a firearm to fire. The dissent points out that even the trigger mechanism of a firearm is not technically necessary in order to make a weapon fire. This line of reasoning distinguishing between accessories and components, and necessary and unnecessary parts to a firearm may have applicability in other areas of the law; however, it

13

unnecessarily obfuscates the court's task here, which is to apply the plain language of R.C. 9.68.

{¶32} R.C. 9.68 makes clear that "[e]xcept as specifically provided by the United States Constitution, Ohio Constitution, state law, or federal law, a person, without further license, permission, restriction, delay, or process, may own, possess, purchase, sell, transfer, transport, store, or keep any firearm, part of a firearm, its components, and its ammunition." A "component" as that term is commonly used means "a constituent part," which serves "to form, compose, or make up a unit or whole." *Merriam-Webster's Online Dictionary*, https://www.merriam-webster.com/dictionary/component, and https://www.merriam-webster.com/dictionary/constituent#h2 (accessed Nov. 19, 2020). Trigger activators, such as bump stocks and trigger cranks, combine with other parts to make up a firearm, and are thus "parts" or "components" as those terms are commonly used.

{¶33} Because Ordinance 91-2018 bans trigger activators, which R.C. 9.68 permits, Ordinance 91-2018 conflicts with R.C. 9.68. Therefore, the city exceeded its home-rule authority under *Mendenhall* in enacting Ordinance 91-2018. We agree with the trial court that Ordinance 91-2018 is invalid.

{¶34} We overrule the city's first assignment of error.

**Award of Attorney Fees and Costs**

{¶35} In its second assignment of error, the city argues that the trial court's award of attorney fees and costs was unreasonable.

{¶36} Both former R.C. 9.68 governing firearms regulations and R.C. 733.61 governing taxpayer actions expressly provided for an award of attorney fees and costs to a prevailing challenger. In terms of reasonableness of fees, "[t]here is a

14

strong presumption that the reasonable hourly rate multiplied by the number of hours worked, which is sometimes referred to as the 'lodestar,' is the proper amount for an attorney-fee award." *Phoenix Lighting Group, L.L.C. v. Genlyte Thomas Group, L.L.C.*, 160 Ohio St.3d 32, 2020-Ohio-1056, 153 N.E.3d 30, ¶ 19. As a general matter, an award of attorney fees is reviewed for an abuse of discretion. *State ex rel. Cincinnati Enquirer v. Allen*, 1st Dist. Hamilton No. C-040838, 2005-Ohio-4856, ¶ 11.

{¶37} At the hearing on attorney fees, the attorneys for Firearm Plaintiffs testified as to their work on the case. All of the attorneys except for one testified that they billed below their typical hourly rate because the clients could not afford to pay their usual rate. The Firearm Plaintiffs presented attorney Robert Lyons, who testified as an expert in legal billing and fees. Lyons testified that he believed the fees were reasonable, given the technical nature of the case, the lowered billing rate by the majority of the attorneys, and that the case included an evidentiary preliminary-injunction hearing.

{¶38} The city presented testimony of Brian Sullivan, a partner at Dinsmore and Shohl. Sullivan testified that he believed the fees were unreasonable given that many of the time entries listed on the attorneys' bills involved communications among counsel. Sullivan noted that the entries lacked any detail as to how the conferences among counsel advanced the case. Sullivan also indicated that the issue was not overly complicated, but presented a legal question of whether Ordinance 91-2018 conflicted with state law.

{¶39} The city argues that the Firearm Plaintiffs' attorneys billed an unreasonable number of hours because the attorneys spent too much time conferring with one another on the case. Nevertheless, the city does not offer any specific

evidence as to why the time spent collaborating on the case unreasonably increased the fee amount. Lyons testified that time spent conferring among counsel can actually expedite a case by eliminating research time. The city also points out that counsel spent 18 minutes reviewing a notification form. Without more specific arguments from the city, however, this court cannot hold that the trial court abused its discretion in awarding the Firearm Plaintiffs attorney fees.

{¶40} The city also argues that the trial court impermissibly awarded costs to the Firearm Plaintiffs. The city does not identify which costs were impermissibly awarded, but the city cites to case law in which litigation expenses, such as expert-witness fees, travel expenses, and photocopying fees were not recoverable as costs. *See, e.g., Bryant v. Walt Sweeney Auto*, 1st Dist. Hamilton Nos. C-010395 and C-010404, 2002-Ohio-2577.

{¶41} The Ohio Supreme Court has stated that courts should look to the relevant statutes in determining the categories of litigation expenses that can be recovered as costs. *Centennial Ins. Co. v. Liberty Mut. Ins. Co.*, 69 Ohio St.2d 50, 430 N.E.2d 925 (1982). At the time of the hearing on fees and costs in this case, the General Assembly had passed 2018 Am.Sub.H.B. 228, which amended former R.C. 9.68 to allow a prevailing challenger to recover "reasonable expenses" against a political subdivision, including, but not limited to, reasonable attorney's fees, court costs, expert-witness fees, and loss of income. R.C. 9.68(B) and (C)(3). In light of the General Assembly's intent to allow a prevailing challenger to recover a broad range of expenses under R.C. 9.68, and in the absence of a specific explanation from the city as to what expenses were impermissibly awarded as costs, we cannot conclude that the trial court abused its discretion in issuing its award to the Firearm Plaintiffs.

16

{¶42}  We overrule the second assignment of error.

**Conclusion**

{¶43}  In conclusion, we determine that Ordinance 91-2018 unconstitutionally conflicts with R.C. 9.68 under the Home Rule Amendment, and therefore the trial court correctly entered judgment in favor of the Firearm Plaintiffs by declaring Ordinance 91-2018 invalid and by entering an injunction against the city's enforcement of the ordinance.  The Firearm Plaintiffs are entitled to an award of attorney fees and costs pursuant to R.C. 733.61 and 9.68, and the city has failed to demonstrate that the trial court abused its discretion in the amount of attorney fees and costs awarded.  Therefore, we affirm the judgment of the trial court.

Judgment affirmed.

**MYERS, P.J.,** concurs.
**CROUSE, J.,** concurs in part and dissents in part.

**CROUSE, J.,** concurring in part and dissenting in part.

{¶44}  I concur that the Firearm Plaintiffs have standing to bring this lawsuit, but I must dissent from the majority's conclusion that the city exceeded its home-rule authority by enacting Ordinance 91-2018.  Because the evidence showed that trigger activators are "accessories" to firearms and not "components," it was error for the trial court to grant summary judgment in favor of the Firearm Plaintiffs and to award them attorney fees.

{¶45}  Ordinance 91-2018 bans "trigger activators."  A trigger activator is defined as "a device designed or functioning to accelerate the rate of fire of a firearm to approximate an automatic weapon, including bump stocks, trigger cranks, slide fire devices, and other similar accessories."  Cincinnati Municipal Code 910-24.  The Firearm Plaintiffs argue that trigger activators can be firearm "components" and therefore Ordinance 91-2018 conflicts with R.C. 9.68.  The city contends that all

17

trigger activators are "accessories," and therefore, Ordinance 91-2018 does not conflict with R.C. 9.68. The General Assembly has not defined "component," and so has left that job to the courts.

{¶46} The trial court, without citing any authority, held that "[w]hen an object that affects the use and function of a firearm becomes attached to the firearm it becomes a component." The majority's holding is slightly narrower in that it states that because some firearms, including custom-made firearms, are originally produced with trigger activators, the trigger activators are not accessories, but rather components of the firearm, without which the firearm would not function. As will be explained below, I do not believe this is the correct way to define a "component."

{¶47} The city points to *Auto-Ordnance Corp. v. United States*, 822 F.2d 1566, 1569-1570 (Fed.Cir.1987), for definitions of a "component" and an "accessory." In *Auto-Ordnance*, a case concerning firearms taxes, the court looked at the dictionary definition of an accessory, which is "a thing of secondary or subordinate importance," "[a]n object or device that is not essential in itself but adds to the beauty, convenience or effectiveness of something else," and " 'equipment, usually demountable and replaceable,' that is added 'for convenience, comfort, safety or completeness.' " *Id.*, citing *Webster's Third New International Dictionary* 11 (1981) and *Webster's New Universal Unabridged Dictionary* 11 (2d Ed.1983). In contrast, the court stated that a "part" is "an integral, constituent, or component part, without which the article to which it is to be joined could not function." *Id.*, citing *United States v. Willoughby Camera Stores, Inc.*, 21 C.C.P.A. 322, T.D. 46,851 (1933). The Firearm Plaintiffs define a "component" as something that is "essential or integral to the operation of a firearm." Thus, both parties agree that a firearm "component" is

18

something needed for a firearm to function, i.e., it is essential or integral to the operation of a firearm.

{¶48} The General Assembly enacted R.C. 9.68 "to provide uniform laws throughout the state regulating the ownership [and] possession * * * of firearms," their components, and their ammunition. *Ohioans for Concealed Carry, Inc. v. Clyde*, 120 Ohio St.3d 96, 2008-Ohio-4605, 896 N.E.2d 967, ¶ 20, citing R.C. 9.68. Nevertheless, "that intent 'does not trump the constitutional authority of municipalities to enact legislation pursuant to the Home Rule Amendment.' " *Id.* at ¶ 29, citing *Am. Fin. Servs. Assn. v. Cleveland*, 112 Ohio St.3d 170, 2006-Ohio-6043, 858 N.E.2d 776, ¶ 31. "No real conflict can exist unless the ordinance declares something to be right which the state law declares to be wrong, or vice versa." *Village of Struthers v. Sokol*, 108 Ohio St. 263, 268, 140 N.E. 519 (1923).

{¶49} Thus, if a trigger activator is essential or integral to the operation of a firearm, or something without which a firearm cannot fire, then the city cannot regulate trigger activators. However, if a trigger activator is not essential or integral to the operation of a firearm, and if a firearm can fire without it, then it is not a "component" and can be regulated by the city without conflicting with R.C. 9.68.

{¶50} Both experts testified that the only part of a firearm that requires a background check before someone can purchase it is the "lower receiver." According to the city's expert, James Yurgealitis, the lower receiver is the lower half of the two pieces that combine and enclose the firing mechanism of an AR-15-type rifle. The lower receiver encompasses the piece that has the pistol grip attached to it, the trigger housing, and the magazine well. It is a hollowed-out molded piece of metal that includes an area in which the trigger protrudes through when the firearm is completely assembled.

19

{¶51} According to the Firearm Plaintiffs' expert, Jeff Steley, once a person purchases the lower receiver, he or she can order parts to assemble the new rifle. He stated that the parts consist of the stock, the barrel, the grip, the sights, and the trigger mechanism, among others. But, according to his testimony, not all of these parts are essential for the rifle to fire.

{¶52} Before I further discuss the testimony in the record, I turn to a case that presents an example of what parts are necessary in order for a rifle to fire: *United States v. Carter*, 465 F.3d 658 (6th Cir.2006). In that case, police had recovered the receiver of a firearm and charged the defendant with illegal possession of a machine gun and various other parts designed and intended for use in converting a firearm into a machine gun. The defendant argued that possession of the receiver alone, without a trigger mechanism, could not constitute possession of a machine gun. *Id.* at 663. However, the government expert testified that he was actually able to fire the receiver without a stock or trigger mechanism. The expert testified:

> * * * because it had an open bolt design, because the firearm will fire with the bolt slamming forward, I loaded a magazine with all three cartridges and inserted it into the firearm. Held the rear against my chest.
>
> Put the magazine in, held it at the magazine port, pulled the bolt back and released it. Upon releasing it the bolt would go forward [stripping] a cartridge off out of the magazine into the chamber and it would fire. Bolt would retract, come back again and fire and fire. It fired three shots consecutively.

*Id.* at 665. The Sixth Circuit found that the "manual manipulation [of the expert's hands on the assembled weapon] constituted a trigger for purposes of the weapon's operation." *Id.* Thus, the receiver was able to be fired without a stock or a trigger mechanism. I will agree that this is an extreme example of what parts or components are actually necessary to fire a rifle, but the defendant certainly possessed enough components to be convicted in that case.

{¶**53**} The Firearm Plaintiffs' expert, Mr. Steley, testified that a stock prevents movement of a rifle and is used for accuracy. Mr. Steley testified that a bump stock is considered a "trigger activator" because it is designed to increase the rate of fire of a semi-automatic rifle. Mr. Steley described how a bump stock operates: "* * * your finger stays on a little ledge just in front of the trigger, and you slide the fore-end, the entire rifle from the fore-end forward, in order to actuate the trigger, and the recoil then operates the bump fire."

{¶**54**} With regard to whether a bump stock is an integral or essential part of a firearm, Mr. Steley was asked:

Q. And what would happen if you had a rifle with a bump stock on it and you took it off and tried to fire it?

\* \* \*

A: The gun would still fire, but not shall we say, comfortably or safely, because it would leave the buffer tube exposed, which is a fairly thin piece of metal. The actual stock * * * being a bump stock * * * encompasses the buffer tube actually giving it protection.

Q: If you had a stock that was a bump stock and you removed it, would the rifle operate as intended?

A:     It would, but again, not safely, it would cause significant pain to the shooter.

\* \* \*

Q:     A person can bump fire a rifle without a bump stock, isn't that true?

A:     That is true, yes.

Q:     But the bump stock makes it easier to bump fire.

A:     Correct.

\* \* \*

Q:     It makes it safer?

A:     Yes.

Q:     And it makes bump firing more convenient?

A:     Yes.

{¶55}  Thus, while it is certainly safer and more comfortable to operate a rifle with a stock, the Firearm Plaintiffs' own expert testified that a rifle will fire without a stock.  Thus, a bump stock is not essential or integral to the operation of the rifle because the rifle would function without it.  Based on the Firearm Plaintiffs' expert testimony alone, it would seem that a bump stock is a thing of secondary or subordinate importance, an object or device that is not essential in itself but adds to the convenience or effectiveness of the rifle.  It is a piece of equipment, usually demountable and replaceable that is added for convenience, comfort, safety or completeness.  Thus, a bump stock is an accessory.[1]

---

[1] I also note that the most recent guidance from the Federal Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") refers to bump stocks as accessories.  *See* 83 C.F.R. 13442.  The ATF has also published in the Federal Register a final rule purporting to classify "a bump stock-type device" as a "machinegun," the ownership of which is prohibited as of March 26, 2019.  83 Fed.Reg. 66514.  There are currently numerous court challenges to this regulation.

22

{¶56} Both experts agreed that a firearm cannot be fired without a trigger mechanism. In *Carter*, 465 F.3d at 665, the court found that the "trigger mechanism" was the "manual manipulation" of the expert's hands on the assembled weapon. The question in this case is whether the trigger activators testified about by the experts are essential or integral to the operation of a firearm.

{¶57} One such trigger activator is a "trigger crank." Mr. Steley testified that a trigger crank is a part that is added to the trigger guard. He stated, "You still have to have the original trigger or a trigger system in the gun, in order for it to fire." He testified that if a trigger crank were integrated into a rifle and you took it away, the rifle would still operate—it would go back to its semiautomatic mode. Mr. Steley was asked on cross examination:

Q: So it doesn't replace the trigger?

A: That's correct.

Q: You add it on?

A: Yes.

Q: When you add it on, it increases the rate of fire of the firearm?

A: Yes.

{¶58} The city's expert, Mr. Yurgealitis, testified that once a trigger crank is attached to a firearm, it is possible to fire the gun without using the trigger crank, depending on the design. Both experts agreed that the trigger crank is a device that is attached to the firearm in order to accelerate the cycle of fire beyond that which you could achieve without the device. Based on the expert testimony, it would seem that a trigger crank is a thing of secondary or subordinate importance, an object or device that is not essential in itself but adds to the convenience or effectiveness of the rifle. It is a piece of equipment, usually demountable and replaceable that is added

for convenience, comfort, safety or completeness. Thus, a trigger crank is an accessory.

{¶59} The experts also testified about binary triggers.[2] Mr. Yurgealitis testified that a binary trigger is a device that, when installed in a semiautomatic rifle, allows the operator to fire one shot when pulling the trigger towards the rear and a second shot upon releasing the trigger. He stated that one company makes a rifle with such a trigger already in it. Otherwise binary trigger devices are sold separately and must be installed in the rifle.

{¶60} Mr. Steley testified that a binary trigger is a "drop in" part and does not require "gunsmithing." He stated, "I can just drop it in myself, two pins and I'm good to go. The trigger is pulled, the gun is fired, the trigger is released, the gun is fired again."

{¶61} Both experts seemed to agree that once installed, a binary trigger is the only trigger mechanism in the rifle. But it was also clear from the testimony that a person can have a functioning rifle without a binary trigger. One does not need a binary trigger in order to fire a rifle. The purpose of a binary trigger is to increase the rate of fire, i.e., how many rounds per minute the firearm is capable of firing beyond that which could be achieved with an ordinary trigger mechanism. Thus, a binary trigger is a device that is demountable and replaceable, and is not essential in itself, but adds to the effectiveness of the firearm. A binary trigger is an accessory.

{¶62} Other trigger activators were mentioned by the experts during their testimony, but neither expert discussed exactly how they worked. Nevertheless, both

---

[2] Plaintiff Jordan Telting testified that the only trigger activator he owns is a binary trigger, which was gifted to him by the Buckeye Firearms Association around the time this lawsuit was filed. At the time of his deposition, Mr. Telting claimed that the binary trigger was not attached to his firearm and he, in fact, had never seen it in person. Because he did not want to be in violation of the law, someone else was holding it for him.

24

experts agreed that all of these trigger activators increase the rate of fire of a semi-automatic rifle.

{¶63} The key to determining whether a trigger activator is a "component" has nothing to do with whether it affects the use and function of a firearm once it is attached. The key is whether a trigger activator is necessary for a firearm to fire. Without a trigger *mechanism*, a firearm would be useless. But, while a trigger *mechanism* is necessary for a firearm to fire, a trigger *activator* is not.

{¶64} In *District of Columbia v. Heller*, 554 U.S. 570, 630, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008), the Supreme Court held that "the requirement that any lawful firearm in the home be disassembled or bound by a trigger lock makes it impossible for citizens to use arms for the core lawful purpose of self-defense and is hence unconstitutional." Recently, in a two to one decision striking down California's ban on large capacity magazines, the Ninth Circuit stated that one of the key takeaways from *Heller* is that a law "cannot permissibly ban a protected firearm's *components that are critical to its operation*." (Emphasis added.) *Duncan v. Becerra*, 970 F.3d 1133, 1146 (9th Cir.2020), citing *Heller* at 630. Thus, I believe that by using the word "component" in R.C. 9.68, the General Assembly was ensuring that municipalities cannot outlaw parts of a firearm critical to its operation. Allowing municipalities to outlaw firearm "components" would render the right to bear arms meaningless.

{¶65} Certainly neither party disputes that United States citizens are prohibited from owning or possessing a fully automatic weapon, i.e., a machine gun. The Supreme Court has emphasized that "the right to keep and bear arms is not 'a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.' " *McDonald v. City of Chicago, Ill.,* 561 U.S. 742, 786, 130 S.Ct.

25

3020, 177 L.Ed.2d 894 (2010), citing *Heller* at 626. *Heller* made clear that "the right secured by the Second Amendment is not unlimited" and certain gun restrictions are constitutional. *Heller* at 626 ("[a]lthough we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.").

{¶66} Any citizen in Cincinnati is permitted to own and possess a semiautomatic firearm with a trigger mechanism and a regular stock. Ordinance 91-2018 prohibits citizens of Cincinnati from owning or possessing a "trigger activator," which accelerates the rate of fire of the firearm to approximate an automatic weapon. Because Ordinance 91-2018's ban of trigger activators does not ban firearm "components," I would hold that it does not conflict with R.C. 9.68 and the city did not exceed its home-rule authority in enacting it. Accordingly, I respectfully dissent as to that issue.

Please note:
    The court has recorded its own entry this date.