[Cite as *Chapel v. Wheeler Growth Co.*, 2023-Ohio-3988.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| WILLIAM CHAPEL, | : | APPEAL NO. C-220662 |
| | | TRIAL NO. A-1904329 |
| Plaintiff-Appellee, | : | |
| | : | *O P I N I O N.* |
| vs. | : | |
| | : | |
| WHEELER GROWTH CO., | : | |
| Defendant-Appellant, | : | |
| and | : | |
| MILLSTONE VALLEY CONTRACTING, INC., et al., | : | |
| | : | |
| Defendants. | | |

Civil Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: November 3, 2023

*Finney Law Firm, LLC, Christopher P. Finney* and *Julie M. Gugino,* for Plaintiff-Appellee,

*Yonas and Phillabaum, LLC, Jason Phillabaum* and *Hope Platzbecker*, for Defendant-Appellant.

**BERGERON, Judge.**

{¶1} One of the venerated stories in American folklore involves a six-year-old George Washington taking a hatchet to his father's cherry tree. Upon discovering the damaged tree, George's father confronted him, leading brave young George to admit, "I cannot tell a lie... I did cut it with my hatchet." Today, most historians consider this story as myth, rather than fact. At trial in the case before us, defendant-appellant Wheeler Growth Company ("Wheeler") spun its own tree-cutting tale—that it had neighbor and plaintiff-appellee William Chapel's permission to cut down his black walnut tree near the property line. Unfortunately for Wheeler, the trial court found its story backed up by about as much proof as the Washington cherry tree legend. Because we conclude that the trial court did not err in finding that Wheeler authorized the tree removal and acted with malice, we affirm its judgment and its decision to award punitive damages and attorney's fees. Furthermore, because the court acted within its discretion in awarding the attorney's fees amount requested by Mr. Chapel, we affirm its award.

I.

{¶2} Wheeler owns a residential property in Cincinnati's Clifton neighborhood. A retaining wall abuts the property's west end, separating it from residential properties located below. In May 2019, heavy rains in the area caused the retaining wall to start collapsing. Justin Haskamp, a local attorney who manages the property on Wheeler's behalf, coordinated with the city of Cincinnati for permitting and approval of plans to replace the retaining wall. He hired defendant Millstone Valley Contracting, LLC ("Millstone"), owned and managed by Mark Schlichter, to complete the teardown and rebuild.

{¶3} Early in the planning phase, Wheeler's plans hit a snag in the form of a 40-year-old black walnut tree, located in Mr. Chapel's yard. Because the tree's trunk rose mere inches from the bottom of Wheeler's collapsing retaining wall, it threatened to interfere with the wall's reconstruction. Mr. Chapel, a former University of Cincinnati carpenter, shared at trial his fondness for his tree, both for its shade and for its walnuts, which he cracked and dried out annually. In late July 2019, Mr. Haskamp, claiming to have Mr. Chapel's permission, ordered Millstone to cut down and remove the tree to facilitate the construction of the new retaining wall. Under Millstone's instruction, a subcontractor removed the tree.

{¶4} Mr. Chapel arrived home that evening from work only to see a stump where a majestic tree once stood. Shocked, he called 911 in an effort to ascertain who stole his tree. Eventually piecing together what happened, Mr. Chapel filed suit against Wheeler and Millstone in September 2019, claiming trespass, violation of R.C. 901.51 (injuring trees on land of another), unjust enrichment, conversion, theft, and replevin, and also accusing Wheeler of acting with malice. After a bench trial in which Wheeler agreed that Millstone and its subcontractor were acting on its behalf, the court entered judgment against Wheeler for trespass (with malice) and for violation of R.C. 901.51. It awarded Mr. Chapel $4,400 in compensatory damages for Wheeler's removal of his tree and some fence panels and for the unauthorized use of heavy equipment on his property. Because the trial court concluded that Wheeler acted with malice, it also awarded $8,800 in punitive damages and signaled its intent to award attorney's fees to Mr. Chapel, who was represented on a contingent fee basis.

{¶5} Throughout this litigation, Mr. Chapel denied ever giving Mr. Haskamp permission to cut down the tree, forming the basis of his malice claim. Mr. Haskamp

3

tells a different story. At trial, he claimed to have had at least four conversations about the tree with Mr. Chapel—two prior to the removal and two immediately after. First, soon after the wall began to collapse in mid-May, Mr. Haskamp, acting on behalf of Wheeler, claims he spoke with Mr. Chapel over the phone, telling him that "the tree had to be cut down from my understanding." Mr. Haskamp indicated that he held this belief because "multiple people," including Millstone and a city of Cincinnati building inspector, Emilio Voltaire, told him the tree had to come down for proper reconstruction of the retaining wall. Mr. Haskamp admits that Mr. Chapel refused to give permission to cut down the tree during this phone call.

{¶6}    In multiple emails to Mr. Voltaire after the call, Mr. Haskamp reiterates his troubles, stating: "Our neighbor behind has a walnut tree that he refused to let us cut down (grow on his side) but our contractor is saying that it has to go. Can you/the city help us get him to act like you made me for my neighbors [sic] driveway repair?" Mr. Voltaire replied the next day explaining that Mr. Haskamp could file a formal complaint to initiate that process. That same day, Mr. Haskamp followed up: "[T]he neighbor with the walnut tree refuses to let us cut down at our expense even so I think we will need your help." Mr. Haskamp suggested that Mr. Chapel "seemed to relent" about the tree after a second conversation that occurred in-person near the properties in which Mr. Haskamp offered to cut down the tree at his own expense. Mr. Chapel denies ever speaking to Mr. Haskamp about the tree before he issued the edict to topple it.

{¶7}    In the lead-up to the unfortunate felling, Mr. Schlichter, on behalf of Millstone, asked Mr. Haskamp whether he had told Mr. Chapel that his tree "needs to go." In response, he asserted, "Yes he does and the city inspector told him so and he

4

agreed." After Mr. Schlichter requested written confirmation, which Mr. Haskamp never supplied, Mr. Haskamp assured him that Mr. Chapel had agreed to the removal according to Mr. Voltaire, the city inspector. At trial, Mr. Voltaire denied ever even asking Mr. Chapel for his permission, let alone telling Mr. Haskamp that he had given it. Despite "No Trespassing" signs placed near the tree facing the workers, Mr. Haskamp ordered the tree cut down in late July 2019.

{¶8} After the cutting of the tree, Mr. Chapel placed an additional "No Trespassing" sign directly on the stump, but Wheeler's contractors removed what remained of the tree and some fence panels anyway, making use of Mr. Chapel's property in the process. In two subsequent phone calls that Mr. Chapel maintains never occurred, Mr. Haskamp claims that Mr. Chapel "said that he was going to surrender."

{¶9} Yet no white flag was raised. Across several years of contentious litigation, the parties eventually arrived at trial, with a victory for Mr. Chapel. Afterwards, the case ballooned far beyond the value of a single, albeit meaningful, black walnut tree. After a hearing with testimony from Mr. Chapel's counsel and from experts on both sides, the court awarded Mr. Chapel $191,984 in attorney's fees and $17,652.53 in costs and expenses, totaling $209,636.53. The court calculated these amounts based on a "lodestar" formula submitted by Mr. Chapel's attorneys: 526 hours worked (plus a few hours for the fees hearing), multiplied individually by the hourly rates of the respective attorneys (ranging from $255 to $475 per hour) and staff (averaging about $150 per hour). They supported their fees application with a 43-page line-item work ledger, breaking down tasks with individual descriptions and listing the corresponding attorney or staff member. Additionally, Mr. Chapel's counsel

testified as to how the fees were justified under the Prof.Cond.R. 1.5(a) factors, which trial courts can use to assess reasonableness. Although Wheeler's expert suggested that the overall hours and fees were unreasonable for a property case involving only a few thousand dollars in potential compensatory damages, he did not challenge the reasonableness of any specific tasks listed in opposing counsel's application. However, Wheeler did cross-examine Mr. Chapel's testifying attorney about the length of specific tasks billed, such as phone calls and emails, and argued generally to the court that Mr. Chapel's attorneys had performed some unnecessary tasks. Wheeler did not contest the hourly rates, and the court concluded that the hours, rates, and expenses were fair and reasonable.

{¶10} On appeal, Wheeler raises three assignments of error. First, it contests the court's finding that it acted with malice in authorizing its contractors to enter Mr. Chapel's property and to remove the tree. Its second assignment of error depends upon the first—it argues the court erred in awarding punitive damages and attorney's fees at all because the trial court can't award either without a finding of malice under these circumstances. Third, Wheeler contends the trial court awarded Mr. Chapel an unreasonably high amount of attorney's fees. Because the first and second assignments relate to the finding of malice, we address them together before turning to the reasonableness of the court's attorney's fees award.

II.

{¶11} Wheeler's first and second assignments of error challenge the court's factual finding of malice. "The standard of review following a civil bench trial is whether the trial court's judgment is against the manifest weight of the evidence as supported by competent, credible evidence." *Downtime Rebuild, LLC v. Trinity*

6

*Logistics, Inc.*, 2019-Ohio-1869, 135 N.E.3d 1253, ¶ 12 (1st Dist.), citing *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 12, 17. In reviewing a trial court's judgment on issues of fact, "the appellate court reviews the entire record, weighs the evidence and all reasonable inferences, considers the credibility of the witnesses, and determines whether the trial court 'clearly lost its way and created a manifest miscarriage of justice.' " *Downtime Rebuild* at ¶ 13, quoting *Fischoff v. Hamilton*, 1st Dist. Hamilton No. C-120200, 2012-Ohio-4785, ¶ 11. Under this standard, the appellate court "must always be mindful of the presumption in favor of the finder of fact," which in this case is the trial court. *Eastley* at ¶ 21. This degree of deference is justified in part because "the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984).

**{¶12}** To award punitive damages in a tort case like this one, the trial court must first conclude that the defendant acted with "malice or aggravated or egregious fraud." R.C. 2315.21(C)(1). Malice is either "(1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm." *Preston v. Murty*, 32 Ohio St.3d 334, 336, 512 N.E.2d 1174 (1987). Although the court's use of "rights *and* safety" in describing the latter type of malice seemed to imply a conjunctive test requiring both elements, the court clarified in the same paragraph that, to find malice under the "conscious disregard" test, a court must conclude that "the party consciously disregarded the injured party's rights *or* safety." (Emphasis added.) *Id.* at 336; *see Kahn v. CVS*

*Pharmacy, Inc.*, 165 Ohio App.3d 420, 2006-Ohio-112, 846 N.E.2d 904, ¶ 16 (1st Dist.) (quoting the "rights or safety" language from *Preston*). Furthermore, malice "is reflected in the use of such terms as 'outrageous,' 'flagrant,' and 'criminal.' " *Preston* at 335-336. Finally, because a plaintiff must prove the defendant's liability for punitive damages by clear and convincing evidence, by implication they must prove malice by the same burden. *See* R.C. 2315.21(D)(4); *Colegrove v. Fred A. Nemann Co.*, 1st Dist. Hamilton No. C-140171, 2015-Ohio-533, ¶ 28.

{¶13} Here, the trial court found clear and convincing evidence that Wheeler acted with "conscious wrongdoing and actual malice" "in its direction and authorization of the occupation and trespass upon Plaintiff's Property." It concluded that "[Wheeler] knew that he shouldn't have taken that tree down. * * * [Mr. Chapel] didn't want them on [his property]. I don't believe one bit that he consented to that." Because the trial court's conclusions were supported by competent, credible evidence, and because none of Wheeler's arguments against the finding of malice show a manifest miscarriage of justice, we decline to disturb the court's finding.

{¶14} The record shows that Wheeler never obtained written permission from Mr. Chapel to cut down the tree on his property and very likely did not obtain oral permission either. Through the testimony of Wheeler's contractors and Mr. Voltaire (the city inspector), messages between Mr. Haskamp and the contractors, and emails exchanged between Mr. Haskamp and Mr. Voltaire, Mr. Chapel presented convincing evidence that he never consented. Additionally, Mr. Chapel's apparent exasperation immediately after discovering that the contractors had removed the tree, a factor the trial court weighed heavily, undermines Mr. Haskamp's insistence that Mr. Chapel had acquiesced.

**{¶15}** Mr. Haskamp's testimony was Wheeler's primary evidence of Mr. Chapel's permission. Of course, "it is well settled law that matters as to the credibility of witnesses are for the trier of fact to resolve." *State v. Saunders*, 1st Dist. Hamilton No. C-160781, 2017-Ohio-8557, ¶ 9. The trial court did not find Mr. Haskamp's testimony credible when stacked up against other witness testimony directly contradicting his assertions, paired with evidence of his evasiveness about the permission issue. Because we are in no better position to reassess the believability of his testimony, and because the rest of the evidence weighs heavily against it, we determine the trial court did not lose its way in concluding Mr. Chapel did not grant Wheeler permission to cut down his tree.

**{¶16}** Even if Mr. Chapel never gave his permission, Wheeler asserts it cannot have "consciously disregarded" his property rights because Mr. Haskamp, acting on its behalf, subjectively believed he either had permission to cut down the tree or the right to cut it down even without direct permission. But this argument does not square with Mr. Haskamp's repeated evasions around the topic of affirmative permission. Wheeler points to Mr. Haskamp's testimony about his own state of mind regarding permission and to messages where he tells his contractors that Mr. Chapel gave permission and orders them to cut down the tree. But when one of his contractors asked for written confirmation, Mr. Haskamp sidestepped the point and assured the contractor not to worry about it. And without other evidence substantiating Mr. Haskamp's claim that he believed he had permission, the issue returns to one of witness credibility, a point on which we again defer to the trial court.

**{¶17}** The only other evidence that Mr. Haskamp might have lacked a "conscious disregard" for Mr. Chapel's rights was his assertion that the city said the

tree had to be removed. But Wheeler produced no city order, report, or testimony to that effect other than Mr. Haskamp's assertion that Mr. Voltaire told him in person that the tree would have to come down. Even if Mr. Haskamp genuinely believed that the city would require removal of the tree for it to approve the new retaining wall, Wheeler produced no evidence that any city employee told him he could remove the tree even without Mr. Chapel's permission. Mr. Haskamp's emails to the city inspector seem to reflect this state of mind: by asking Mr. Voltaire for help in getting Mr. Chapel's permission, he showed that he knew he either needed the permission or a more direct city order overriding Mr. Chapel's refusal. Mr. Voltaire testified that neither he nor any other city employee, to his knowledge, ever gave Mr. Haskamp the go-ahead or issued such an order. Thus, Wheeler's argument that it acted with the subjective belief that it had permission or the authority to cut down the tree without permission is not supported by the record. Therefore, we find at least some competent, credible evidence supporting the trial court's conclusion that Wheeler acted with malice by consciously disregarding Mr. Chapel's property rights. We accordingly overrule Wheeler's first assignment of error.

{¶18} As discussed above, malice is the gateway to punitive damages in a tort case. In turn, a punitive damages award opens the door to attorney's fees. At common law and throughout Ohio's history, "recovery of reasonable attorney fees has always been permitted when punitive damages are awarded." *Cruz v. English Nanny & Governess School*, 169 Ohio St.3d 716, 2022-Ohio-3586, 207 N.E.3d 742, ¶ 38. "As a general matter, an award of attorney fees is reviewed for an abuse of discretion." *Buckeye Firearms Found. Inc. v. City of Cincinnati*, 2020-Ohio-5422, 163 N.E.3d 68, ¶ 36 (1st Dist.). Abuse of discretion occurs when "a court exercis[es] its judgment, in

an unwarranted way, in regard to a matter over which it has discretionary authority." *Johnson v. Abdullah*, 166 Ohio St.3d 427, 2021-Ohio-3304, 187 N.E.3d 463, ¶ 35. Because we decline to disturb the trial court's finding of malice, we conclude that it acted properly within its discretion in awarding both punitive damages and attorney's fees. Therefore, we overrule Wheeler's second assignment of error.

## III.

**{¶19}** Having concluded that the trial court acted within its authority in awarding attorney's fees, we turn to Wheeler's challenge to the amount of fees awarded. Wheeler calls for an overall 50 percent reduction in the trial court's $191,984 fee award based on two lines of attack: duplicative or excessive billing and overall disproportionality between the damages and the fee award. Because Wheeler declined to challenge the hourly rates put forth by Mr. Chapel's attorneys either at the attorney's fees hearing or on appeal, and because our own review of the record reveals no reason to disturb the trial court's conclusion that the hourly rates were fair and reasonable, we treat that issue as conceded.

**{¶20}** Where the trial court is authorized by statute to award attorney's fees, " 'the amount of such fees is within the sound discretion of the trial court. Unless the amount of fees determined is so high or so low as to shock the conscience, an appellate court will not interfere.' " *Bittner v. Tri-County Toyota, Inc.*, 58 Ohio St.3d 143, 146, 569 N.E.2d 464 (1991), quoting *Brooks v. Hurst Buick-Pontiac-Olds-GMC, Inc.*, 23 Ohio App.3d 85, 91, 491 N.E.2d 345 (12th Dist.1985). In determining the appropriate attorney's fees award, Ohio courts, like federal district courts, "are not required to act as 'green-eyeshade accountants' and 'achieve auditing perfection' but instead must simply [] do 'rough justice.' " *Northeast Ohio Coalition for the Homeless v. Husted*,

831 F.3d 686, 703 (6th Cir.2016), quoting *Fox v. Vice*, 563 U.S. 826, 838, 131 S.Ct. 2205, 180 L.Ed.2d 45 (2011).

**{¶21}** The baseline for calculating the prevailing party's attorney's fees is known as the "lodestar," which is calculated by multiplying the number of hours reasonably worked times the hourly rates of attorneys and their staff who worked those hours. *Bittner* at 145. Under *Bittner*, after first calculating the lodestar amount, trial courts could then "modify that calculation by application of the factors listed in DR 2-106(B)," which are now superseded by Prof.Cond.R. 1.5(a), suggesting a firm two-step process. *Bittner* at 145; *Phoenix Lighting Group, LLC v. Genlyte Thomas Group, LLC*, 160 Ohio St.3d 32, 2020-Ohio-1056, 153 N.E.3d 30, ¶ 12. However, the court recently modified *Bittner* based in part on the United States Supreme Court's holding in *Perdue v. Kenny A.*, 559 U.S. 542, 130 S.Ct. 1662, 176 L.Ed.2d 494 (2010), that "factors subsumed in the lodestar calculation cannot be used as a ground for increasing an award above the lodestar." *Perdue* at 546; *see Phoenix Lighting* at ¶ 14-17. Thus, the lodestar amount enjoys a "strong presumption" as the accurate calculation of attorney's fees, and "[e]nhancements to the lodestar should be rarely granted and allowed only when the prevailing party has presented evidence that * * * the lodestar does not take into consideration any factor that may be properly considered in determining a reasonable fee," namely, the Prof.Cond.R. 1.5(a) factors. *Phoenix Lighting* at ¶ 19. The presumption in favor of the lodestar amount and the limits on deviating from it apply whether the appellate court is reviewing a trial court's upward or downward deviation. *See Calypso Asset Mgt., LLC v. 180 Indus., LLC*, 2021-Ohio-1171, 171 N.E.3d 790, ¶ 38 (10th Dist.).

{¶22} But *Phoenix Lighting* involved appellate review of a trial court's departure from the lodestar amount, ultimately concluding that it was unjustified because all the factors relied on in the enhancement were already reflected by the amount of hours used in the lodestar calculation. *Phoenix Lighting* at ¶ 28. Here, by contrast, the trial court adopted the lodestar amount as-is, accepting the hours and hourly rates claimed in Mr. Chapel's application for attorney's fees as fair and reasonable. Thus, although *Bittner* and its progeny certainly guide our analysis, the modified test in *Phoenix Lighting* does not speak directly to the primary issue in this case: whether the trial court abused its discretion in concluding that the 526+ hours logged by Mr. Chapel's attorneys and their staff were reasonable for the purposes of the initial lodestar calculation. To answer that question, and pursuant to Wheeler's challenge, we consider whether the trial court erroneously accepted the hours logged in the application for attorney's fees while overlooking widespread instances of duplicative or excessive billing.

{¶23} In practice, the trial court should start with counsel's billing records and other materials submitted in the application for attorney's fees to determine whether they conform to fair and reasonable practices under the circumstances of the case. If the court concludes that certain entries or categories of entries billed were excessive, unnecessary, or the like, it can, within its discretion, reduce the number of hours included in the lodestar calculation by a certain amount or percentage. *See, e.g.*, *Perdue* at 548 (noting that the district court below initially cut counsel's requested hours by a flat percentage amount for instances of vague and excessive billing and not disturbing that part of the district court's lodestar analysis). For instance, a trial court could impose an across-the-board percentage reduction for "excessive, unnecessary,

vague, and/or inappropriate billing entries," *Ohio Right to Life Soc., Inc. v. Ohio Elections Comm.*, 590 F.Appx. 597, 603-604 (6th Cir.2014), or eliminate hours "[w]here the documentation of hours is inadequate." *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983); *see State ex rel. Harris v. Rubino*, 156 Ohio St.3d 296, 2018-Ohio-5109, 126 N.E.3d 1068, ¶ 7 (barring attorney-fee applications that include block-billed time entries). If the trial court concludes that such practices occurred and pares back the hours accordingly, it should explain its reasoning to facilitate appellate review.

**{¶24}** Wheeler claims that Mr. Chapel's attorneys logged tasks that were not necessary for prosecution of his claims. Because "it is unreasonable to expect the court to review the bill line by line," Wheeler insists, we need not undertake that exercise and should instead flatly reduce the fee award across the board by up to 50 percent. But parsing Mr. Chapel's application for attorney's fees line-by-line for instances of excessive billing *was* the task before Wheeler in bringing this challenge, and it falls short on that endeavor. At the hearing on attorney's fees and on appeal, Wheeler did not sufficiently identify specific line items that the court unjustifiably included in its lodestar calculation. Instead, it only points to a handful of examples where Mr. Chapel's attorneys billed for reviewing each other's work, for meetings or conversations with each other, and for the same site visits and meetings with Mr. Chapel. Rather than duplicative or excessive work, these tasks represent common forms of collaboration within a law firm. Attorneys in the same firm help each other advance their shared client's cause by collaborating on legal strategy, research, writing, and quality control thereof. Wheeler fails to show how, in this instance, Mr. Chapel's attorneys engaged in *unreasonable* forms of teamwork and managing client

14

relationships. Additionally, Mr. Chapel's application for attorney's fees includes a comprehensive, 43-page, line-item billing log with descriptions of each individual task logged. Wheeler does not point us to any vague or truly duplicative billing entries, nor does it claim that Mr. Chapel's counsel inadequately documented their hours. A party generally cannot identify only a few entries of a 43-page line-item and reasonably expect the trial court (or this court) to suddenly slice the bill in half. Therefore, we are not persuaded that the trial court abused its discretion in failing to reduce the hours included in its lodestar calculation due to duplicative or excessive billing practices.

{¶25} Next, Wheeler attacks the fee award on the basis of proportionality. It compares the $4,400 compensatory damages award and the $8,800 punitive damages award (totaling $13,200) to the $191,984 award for attorney's fees, an amount 14.5 times Mr. Chapel's total damages recovery and 43.6 times his compensatory damages. These disparities, it argues, should "shock the conscience." *Bittner*, 58 Ohio St.3d at 146, 569 N.E.2d 464.

{¶26} On the surface, these ratios admittedly give us some pause. Even so, it is well-settled that Ohio courts have no firm rule on fee proportionality. " 'A rule of proportionality would make it difficult, if not impossible, for individuals with meritorious * * * claims but relatively small potential damages to obtain redress from the courts.' " *Id.* at 144, quoting *Riverside v. Rivera*, 477 U.S. 561, 578, 106 S.Ct. 2686, 91 L.Ed.2d 466 (1986). Accordingly, we have upheld an attorney's fees and costs award despite a double-digit disparity between it and the plaintiff's recovery. *Williams v. Sharon Woods Collision Ctr., Inc.*, 2018-Ohio-2733, 117 N.E.3d 57, ¶ 21 (1st Dist.) (overruling an attorney fee challenge in an action for violations of the Ohio Consumer Sales Practices Act where the jury awarded damages of $8,079 and the trial court

awarded over $85,000 in attorney fees and costs). We noted "the amount of fees awarded need not bear a direct relationship to the dollar amount of the damages." *Id.* at ¶ 21, citing *Bittner* at 144. Indeed, "proportionality is not synonymous with reasonableness." *Dipenti v. Park Towers Condo. Assn.*, 10th Dist. Franklin No. 19AP-384, 2020-Ohio-4277, ¶ 34.

{¶27} Wheeler directs our attention to a Tenth District case, *Wing Leasing, Inc. v. M&B Aviation, Inc.*, 44 Ohio App.3d 178, 542 N.E.2d 671 (10th Dist.1988), for that court's proposition that a $46,000 attorney's fees award in a case where the plaintiff recovered $3,850 in compensatory and punitive damages was "in no way" reasonable. *Wing Leasing* at 184. The court relied on the results obtained factor, noting that the plaintiff lost several claims on a directed verdict. *Id.* ("It is unreasonable for a plaintiff to recover fees which were expended in pursuit of a substantial number of claims which were defeated by the defendant."). Because "a number of claims were disallowed and the attorney fee award vastly exceeded the amount recovered," "[t]he attorney fee award was unreasonable in amount and therefore in error." *Id.* However, this part of the court's opinion is essentially dicta because the court remanded the case on other grounds. *Id.* at 183-184 (rejecting the court's finding of actual malice, limiting attorney's fees only for those that could be attributed to discovery violations, and remanding for the trial court to determine that amount). Furthermore, in line with *Bittner*, the Tenth District "has repeatedly held that attorney fees need not be mathematically proportionate to the amount of damages," *Miller v. Grimsley*, 197 Ohio App.3d 167, 2011-Ohio-6049, 966 N.E.2d 932, ¶ 16 (10th Dist.), and the court has upheld multiple fee awards more than ten times the size of the judgment. *Dipenti* at ¶ 34 (upholding a $12,642 fee award, more than

17 times the $725 underlying judgment); *Schultz v. Wurdlow*, 10th Dist. Franklin No. 11AP-62, 2012-Ohio-3163, ¶ 1, 25-26 (upholding a $14,782 fee award in a dispute over a $700 security deposit). The Eighth District has upheld similar fee awards. *Alcorso v. Correll*, 8th Dist. Cuyahoga No. 110218, 2021-Ohio-3351, ¶ 21, 49 (affirming a $26,825 fees and costs award, about 30 times the $892 underlying judgment); *Christen v. Continental Ents.*, 2020-Ohio-3665, 154 N.E.3d 1192, ¶ 52 (8th Dist.) (affirming an award of $23,500 in attorney fees on recovery of $850 security deposit, more than 27 times the recovery amount). Therefore, *Wing Leasing* does not support Wheeler's overall proportionality argument; more persuasive is our sister districts' adherence to *Bittner* in rejecting challenges to attorney's fees awards based purely on proportionality.

{¶28} In line with *Bittner*, *Phoenix Lighting*, our own precedent, and that of our sister districts, we again decline to draw a firm line on the proportionality between an attorney's fees award and the amount of an underlying judgment. Nor, if we wanted to do so, would we know where to start—Wheeler offers no case or authority that specifies any rigid requirement to guide such an analysis. To the contrary, the trial court sat in a better position to assess the application for attorney's fees in light of the complexity of the legal issues at hand, the time and labor required to achieve Mr. Chapel's goals, and the results obtained by his attorneys. By all accounts, he received an excellent outcome at trial, succeeding on all his trespass claims and proving malice, leading to full compensatory damages and to punitive damages twice that amount. The trial court heard testimony from Mr. Chapel's counsel on how the fees satisfied the reasonableness factors under Prof.Cond.R. 1.5(a) and from experts on both sides. The court ultimately adopted the lodestar amount proposed by Mr. Chapel's attorneys,

which enjoys a "strong presumption" under Ohio law. *Phoenix Lighting*, 160 Ohio St.3d 32, 2020-Ohio-1056, 153 N.E.3d 30, at ¶ 19. By not deviating upward or downward from the lodestar amount, the trial court acted within its discretion, and we are satisfied that it achieved "rough justice." *Fox*, 563 U.S. at 838, 131 S.Ct. 2205, 180 L.Ed. 2d 45. Even though the disparity between the attorney's fees award and the compensatory and punitive damages recovered here might raise an eyebrow (or two), it doesn't quite shock our conscience. Therefore, we decline to impose an overall reduction in the attorney's fees award. We overrule the third assignment of error and affirm the trial court's award of attorney's fees and costs.

\* \* \*

{¶29} In sum, the trial court did not err in finding that Wheeler acted with malice in ordering the removal of Mr. Chapel's tree and the requisite occupation of Mr. Chapel's property. Because the malice finding stands, the court acted within its discretion in awarding punitive damages and attorney's fees. And because the trial court acted within its discretion in determining the amount of attorney's fees and costs, we decline to disturb its award. Therefore, we affirm the trial court's judgment and award of attorney's fees and overrule Wheeler's three assignments of error.

Judgment affirmed.

ZAYAS, P.J., and KINSLEY, J., concur.

Please note:

The court has recorded its entry on the date of the release of this opinion.