[Cite as *Geisenfeld v. Geisenfeld*, 2026-Ohio-205.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| RICHARD I. GEISENFELD | : | |
| | : | C.A. No. 30487 |
| Appellees | : | |
| | : | Trial Court Case No. 2022 CV 02376 |
| v. | : | |
| | : | (Civil Appeal from Common Pleas |
| DIANE R. GEISENFELD, ETC., ET AL. | : | Court) |
| | : | |
| Appellant | : | **FINAL JUDGMENT ENTRY &** |
| | : | **OPINION** |

. . . . . . . . . . .

Pursuant to the opinion of this court rendered on January 23, 2026, the judgment of the trial court is affirmed. Appellee's motion to strike appellant's reply brief or to disregard parts of it is sustained.

Costs to be paid as stated in App.R. 24.

Pursuant to Ohio App.R. 30(A), the clerk of the court of appeals shall immediately serve notice of this judgment upon all parties and make a note in the docket of the service. Additionally, pursuant to App.R. 27, the clerk of the court of appeals shall send a certified copy of this judgment, which constitutes a mandate, to the clerk of the trial court and note the service on the appellate docket.

For the court,

ROBERT G. HANSEMAN, JUDGE

LEWIS, P.J., and HUFFMAN, J., concur.

KEITH R. KEARNEY, Attorney for Appellant
RICHARD L. CARR, JR., Attorney for Appellee Richard I. Geisenfeld

HANSEMAN, J.

{¶ 1} In this case, defendant-appellant Diane Geisenfeld appeals from a judgment in a civil action regarding her administration of the revocable living trust of her deceased mother. The trial court determined that Diane had fraudulently induced a settlement agreement to resolve the civil action and that she had violated fiduciary duties, and thus it awarded damages and attorney fees to plaintiff-appellee Richard Geisenfeld. According to Diane, the trial court abused its discretion in interpreting the parties' settlement agreement and in finding she violated fiduciary duties. Diane further contends that even if she is found to have breached the agreement, the court abused its discretion in awarding Richard the full amount of his litigation costs and attorney fees.

{¶ 2} Having reviewed the record and the applicable law, we agree with the trial court that Diane fraudulently induced Richard to sign a settlement agreement. The agreement was ambiguous, and therefore the court was allowed to hear extrinsic evidence. After doing so, the court found that Diane had acted maliciously and that she had violated her fiduciary duty by failing to disclose that the items for which Richard had bargained were wholly meaningless, worthless, or non-existent. No error occurred in that regard. The court also did not abuse its discretion in awarding damages and attorney fees to Richard. Accordingly, the judgment of the trial court is affirmed.

{¶ 3} As a further matter, Richard's motion to strike Diane's reply brief or to disregard portions of the brief relating to punitive damages is sustained. Diane improperly raised new issues in the reply brief that she had not previously asserted.

I. Facts and Course of Proceedings

{¶ 4} This case arose from a dispute among siblings over administration of a revocable living trust ("Trust") of their mother, Beverly Geisenfeld. In May 2022, Richard filed a complaint for breach of duty to report and for breach of fiduciary duty against Diane and another sister, Nancy Seaman. According to the complaint, Beverly died in August 2020, and Diane was the trustee of the Trust, which had been established in November 2018. All three children were equal beneficiaries. Under the complaint's first cause of action, Richard alleged that Diane had committed various improper acts, including removing personal items from Beverly's home and refusing to provide an accounting; failing to provide copies of the final trust tax return; failing to provide a status and accounting of antiques consigned to an auctioneer; failing to provide an accounting of full expense line items from 2020 and 2021, including legal fees and disbursements to Diane and Nancy; and failing to provide a list of the personal property items in Diane's and Nancy's possession. In the second cause of action, Richard alleged that Diane had failed to equally divide Beverly's assets between beneficiaries and that she had taken Beverly's jewels, furs, and other personal items in violation of her fiduciary duty.

{¶ 5} After being served, Diane filed an answer and counterclaim, which alleged that Richard had taken trust property without the trustee's consent and had either retained trust property or transferred it to third parties. Shortly thereafter, Richard responded to the counterclaim. Service was ultimately made on Nancy, and she filed an answer in July 2022. Following a scheduling conference, the court set a bench trial to begin in June 2023.

3

**{¶ 6}** Richard filed an amended complaint in August 2022, which added breach of contract claims against Nancy and Diane, asserting that they allegedly conspired to block the property administration and account of Bevely's trust. Nancy followed with a motion to dismiss the breach of contract claim under Civ.R.12(B)(6). The court granted the motion in September 2022 and dismissed Nancy as a party. The dispute thereafter continued between only Richard and Diane.

**{¶ 7}** In May 2023, the parties filed an agreed entry stating they had decided to participate in mediation and asked the court to order mediation. The court did so and vacated the trial date and all associated orders. Although the parties participated in mediation in late August 2023, they did not reach a settlement agreement. The court then set a bench trial for February 8, 2024. In January 2024, the court filed an order of dismissal, noting that the case had been settled and that it would be conditionally dismissed without prejudice until such time as the parties filed a final dismissal entry with prejudice. Order of Dismissal (Jan. 18, 2024), p. 1. The court retained jurisdiction to enforce the settlement agreement. *Id*. The court later granted Richard's request for an extension of time and gave the parties leave until March 8, 2024, to file the final dismissal entry.

**{¶ 8}** On March 8, Richard asked for a 10-day extension of time to file either the dismissal entry or a motion to enforce the settlement. The court granted the motion, and on March 11, Richard filed a motion seeking to enforce the settlement. Richard attached a copy of the settlement agreement ("Agreement") to the motion. In the motion, Richard claimed that Diane had failed to deliver several items of "sentimental and (pecuniary value)" to him as required by the Agreement. These included a wood holder for a Chinese set; an original golf bag bearing the name tag of Richard's father; and a cookbook kept by the parties' mother. Motion to Enforce Settlement (Mar. 11, 2024) ("Enforcement Motion"), p. 2. Richard

4

asked the court to enforce the Agreement and to let him "recover the reasonable attorney fees and expenses incurred in doing so as compensatory damages." *Id*. at p. 3.

{¶ 9} In response, Diane filed a motion to dismiss Richard's motion. Motion to Dismiss Plaintiff's Motion to Enforce Settlement Agreement (Mar. 21, 2024). In the motion, Diane claimed that she had complied with the Agreement and also asked for attorney fees. *Id*. at p. 1-3. After Richard replied, the court set a hearing on the motion to enforce the settlement. Ultimately, the court held the hearing on January 10, 2025.

{¶ 10} At the end of the hearing, the court informed the parties of its preliminary conclusions about the only two items remaining in contention. These were a golf bag and Beverly's hand-written recipes. Concerning these items, the court found that (1) Beverly had gifted the golf bag to Diane's son, and it had exited the trust at that time; and (2) Diane, as trustee, would have had superior knowledge about the recipes and would have had a duty to prevent ambiguities from arising. The court further found the recipes did exist and that Diane needed to copy any of those recipes in her control and provide them to Richard. As a possible solution, the court suggested that Diane redouble her efforts to locate the recipes, make a good-faith effort, and provide copies of the recipes to Richard. The court then set a telephone conference for February 6 for the parties to report back to the court. *See* Transcript of Proceedings (Jan. 10, 2025) ("Tr."), 150-157 (stating the court's preliminary conclusions).

{¶ 11} On the day of the telephone conference, the court filed an order setting a deadline of February 13 for the parties to submit written filings regarding the search and production of any handwritten recipes. The parties responded, and Diane filed an affidavit about her attempts to locate the recipes, which resulted in her finding and giving Richard 18 handwritten recipes, many of which he already had. The court then filed a decision

5

granting Richard's motion to enforce the settlement agreement. *See* Decision, Order and Entry Granting Plaintiff's Motion to Enforce Settlement Agreement (Handwritten Recipes), Awarding Nominal Damages (Handwritten Recipes) and Full Litigation Attorneys' Fees and Costs as Punitive Damages (Apr. 22, 2025) ("Settlement Order").

{¶ 12} Per the court's directive in the Settlement Order, Richard submitted a notice of attorney fees and expenses, which included $38,042 in attorney fees and $2,887.21 in expenses, representing fees and expenses since the beginning of the litigation. Evidence on these matters had already been presented at the hearing. The court then filed a judgment entry ordering Diane to pay Richard a total of $41,929.71, which included his full litigation costs and attorney fees as well as a $1,000 damages award concerning the recipes. Final Judgment Entry (Apr. 28, 2025).

{¶ 13} Before the time to appeal had expired, Diane asked for a telephone conference to clarify the amount of attorney fees because the court had previously stated in the hearing that if fees were awarded, the court would only be looking at fees incurred in connection with enforcing the settlement. However, the court denied the request. Decision, Order, and Entry Denying Defendant's Motion for Telephone Conference to Clarify Judgment Entry (May 19, 2025). Diane timely appealed from the April 28, 2025 final judgment. Her appeal raises two assignments of error.

## II. Settlement Agreement

{¶ 14} Diane's first assignment of error states:

> THE TRIAL COURT ABUSED ITS DISCRETION IN FINDING THAT DIANE KNEW OR SHOULD HAVE KNOWN THAT VARIOUS LOOSE-LEAF HANDWRITTEN RECIPES WERE CONTEMPLATED WHEN RICHARD

6

NEGOTIATED RECEIVING A COPY OF DECEDENT'S COOKBOOK IN THE PARTIES' SETTLEMENT AGREEMENT.

{¶ 15} Under this assignment of error, Diane contends that the terms in the Agreement were not ambiguous, and the trial court erred by effectively creating a new contract the parties did not contemplate. Diane further argues Richard failed to present sufficient evidence for the court to find that he met the burden of establishing a breach of contract. Before we consider these issues, we outline the pertinent law.

A. Law Relating to Settlement Agreements

{¶ 16} "It is axiomatic that a settlement agreement is a contract designed to terminate a claim by preventing or ending litigation and that such agreements are valid and enforceable by either party." (Citations omitted.) *Continental W. Condominium Unit Owners Assn. v. Howard E. Ferguson, Inc.*, 74 Ohio St.3d 501, 502 (1996). The law highly favors these agreements. *Id*. "Settlement agreements are essentially a contract and are governed by the law of contracts. . . . To establish a breach of a settlement agreement, the party alleging the breach must prove: 1) existence of the Settlement Agreement, 2) performance by the plaintiff, 3) breach by the defendant, 4) resulting damages or loss to the plaintiff." *Raymond J. Schaefer, Inc. v. Pytlik*, 2010-Ohio-4714, ¶ 24 (6th Dist.), citing *Rondy, Inc. v. Goodyear Tire Rubber Co*, 2004-Ohio-835, ¶ 7 (9th Dist.).

{¶ 17} "The role of courts in examining contracts is to ascertain the intent of the parties." *St. Marys v. Auglaize Cty. Bd. of Commrs*., 2007-Ohio-5026, ¶ 18, citing *Hamilton Ins. Servs., Inc. v. Nationwide Ins. Cos.*, 86 Ohio St.3d 270 (1999). "The intent of the parties to a contract is presumed to reside in the language they chose to employ in the agreement." *Kelly v. Med. Life Ins. Co*., 31 Ohio St.3d 130 (1987), paragraph one of the syllabus. "Where the terms in a contract are not ambiguous, courts are constrained to apply the plain language

of the contract." *St. Marys* at ¶ 18, citing *Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm*, 73 Ohio St.3d 107 (1995). "Intentions not expressed in the writing are deemed to have no existence and may not be shown by parol evidence." *Aultman Hosp. Assn. v. Community Mut. Ins. Co.*, 46 Ohio St.3d 51, 53 (1989) (citing cases).

{¶ 18} "Contractual language is 'ambiguous' only where its meaning cannot be determined from the four corners of the agreement or where the language is susceptible of two or more reasonable interpretations." *United States Fid. & Guar. Co. v. St. Elizabeth Med. Ctr.*, 129 Ohio App.3d 45, 55-56 (2d Dist. 1998), citing *Potti v. Duramed Pharmaceuticals, Inc.*, 938 F.2d 641, 647 (6th Cir. 1991). Where contracts are ambiguous, courts may properly consider "'extrinsic evidence,' i.e., evidence outside the four corners of the contract," to decide the parties' intent. *Id.*, citing *Blosser v. Carter*, 67 Ohio App.3d 215, 219 (4th Dist. 1990). Extrinsic evidence can include: "(1) the circumstances surrounding the parties at the time the contract was made, (2) the objectives the parties intended to accomplish by entering into the contract, and (3) any acts by the parties that demonstrate the construction they gave to their agreement." *Id.* at 56. "However, courts may not use extrinsic evidence to create an ambiguity; rather, the ambiguity must be patent, *i.e.*, apparent on the face of the contract." *Id.*, citing *Schachner v. Blue Cross & Blue Shield of Ohio*, 77 F.3d 889, 893 (6th Cir. 1996).

{¶ 19} "Contract interpretation is a matter of law, and questions of law are subject to de novo review on appeal." *St. Marys,* 2007-Ohio-5026, at ¶ 38, citing *Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm*, 73 Ohio St.3d 107, 108 (1995). In this type of review, "we independently review a trial court's decision and accord it no deference." *Clark v. Beyoglides*, 2021-Ohio-4588, ¶ 19 (2d Dist.), citing *Northeast Ohio Apt. Assn. v. Cuyahoga Cty. Bd. of Commrs.*, 121 Ohio App.3d 188, 192 (8th Dist. 1997).

{¶ 20} With these standards in mind, we consider the court's ruling on the Agreement.

## B. The Agreement

**{¶ 21}** As noted, Richard brought this case on grounds related to Diane's administration of the Trust and breach of fiduciary duties; Diane's counterclaim alleged that Roger had improperly taken Trust property. After Richard's complaint against another sister, Nancy, was dismissed, the parties unsuccessfully tried mediation in August 2023 and then prepared for the scheduled February 2024 trial. They settled the case in January 2024, shortly before trial. At all times, both sides were represented by attorneys and were also involved in preparing the Agreement, although Richard's attorney actually drafted it. Tr. 68. Both parties also signed the Agreement. Richard signed on January 30, 2024, and Diane signed on February 2, 2024. *See* Joint Ex. I, p. 4-5.[1]

**{¶ 22}** The Agreement stated a few basic facts about the litigation and said, in pertinent part, as follows:

> **WHEREAS,** the Parties, so as to avoid the cost, frustration, and uncertainty of continued litigation, have mediated their disagreements and come to the terms of a settlement that resolves all matters of dispute between them.

> **NOW, THEREFORE**, in consideration of the above promises and the mutual release and other agreements hereinafter set forth, and for other good and valuable consideration, the adequacy and sufficiency of which are hereby acknowledged, and intending to be legally bound, the Parties hereby agree as follows:

---

1. All references to exhibits in this opinion concern the plaintiff's, defendant's, and joint exhibits admitted at the January 10, 2025 hearing.

9

**1. Financial Consideration Paid by the Trust to Mr. Geisenfeld Upon Execution of This Settlement Agreement**. Upon execution of this Settlement Agreement, Thirty-Five Thousand Dollars ($35,000.00) of the cash held by the Trust shall be paid to Mr. Geisenfeld within fifteen (15) days of the later date of parties' execution of this Settlement Agreement.

**2. Receipt and Retention of Property by Ms. Geisenfeld**. Ms. Geisenfeld shall receive and retain all remaining items held by Ms. Geisenfeld, including (1) items held by Furniture Man; (2) items taken back from Furniture Man; (3) all items that are unaccounted for, including Mr. Geisenfeld's mother's wedding ring, jewelry collection, and numerous furs; (4) all other items within the appraisal; and (5) the dining room table and sundry antique chairs.

**3. Receipt and Retention of Property by Mr. Geisenfeld**. Mr. Geisenfeld shall receive and retain (1) the bamboo framed Japanese Empress; (2) 3 Chinese frame prints from Mr. Geisenfeld's mother's dining room; (3) wood holder for a Yellow 5-piece Chinese set; (4) copy of Mr. Geisenfeld's mother's cookbook; (5) original photo of Irving and Mildred Sanderson in its existing frame; and (6) Mr. Geisenfeld's father's used golf clubs in the original golf bag including the covers (except for one missing cover).

. . .

5. **Legal Fees.** Mr. Geisenfeld shall pay all remaining legal fees and expenses incurred by him as Plaintiff relating to this lawsuit. Ms. Geisenfeld shall bear all legal fees incurred by her as Defendant relating to this lawsuit.

Neither Party shall be held responsible for the other Party's legal fees and expenses.

. . .

**12. Representation by Counsel**. Each party to this Settlement Agreement has been advised by counsel in regard to the terms of this Settlement Agreement and the execution of it or has had sufficient opportunity to consult with counsel in regard to the same.

**13. Modification; Severability**. The terms of this Settlement are contractual and not merely a recital. No modification or waiver shall be effective unless such modification or waiver is in writing and executed by the Parties. In the event that any of the provisions of this Settlement Agreement are held invalid or unenforceable, all other provisions shall continue in force.

**14. Entire Agreement.** This Settlement Agreement (including any ancillary agreements referenced in or relating to this Settlement Agreement) constitutes the entire agreement between the Parties relating to the subject matter hereof. All prior negotiations, representations, promises, and agreements are merged in this Settlement Agreement and shall be of no force or effect unless set forth herein.

Joint Ex. I, p. 1-3.

{¶ 23} By the time of the evidentiary hearing, Diane had complied with the Agreement with the exception of two items: a golf bag used by the parties' father and copies of handwritten recipes of the parties' mother. After hearing the evidence, the court found that Richard had failed to carry his burden of proving that the golf bag and a name tag on the bag still existed at the time of the Agreement. Settlement Order, p. 4.

11

{¶ 24} Concerning the cookbook, the court found that although both parties had participated in drafting the Agreement, any ambiguities in the Agreement must be construed against Diane, due to her fiduciary position and "concomitant superior knowledge and duties of disclosure." Settlement Order, p. 3. The court reasoned: "From that vantage, Richard's request for 'a copy of Mr. Geisenfeld's mother's cookbook' demanded clarification on the part of Diane Geisenfeld-Pioso." (Empasis in original.) *Id.*

{¶ 25} The first matter to consider is whether the Agreement itself is ambiguous. "Common words appearing in a written instrument will be given their ordinary meaning unless manifest absurdity results, or unless some other meaning is clearly evidenced from the face or overall contents of the instrument." *Alexander v. Buckeye Pipe Line Co.*, 53 Ohio St.2d 241 (1978), paragraph two of the syllabus. "If no ambiguity appears on the face of the instrument, parol evidence cannot be considered in an effort to demonstrate such an ambiguity." *Shifrin v. Forest City Ents., Inc.*, 64 Ohio St.3d 635, 638 (1992), citing *Stony's Trucking Co. v. Pub. Util. Comm.*, 32 Ohio St.2d 139, 142 (1972).

{¶ 26} A "cookbook" is commonly defined as "a book of cooking directions and recipes." *Merriam-Webster Online*, https://www.merriam-webster.com/ dictionary/cookbook (accessed Dec. 15, 2025) [https://perma.cc/QHC8-QRYG]. A "book" is commonly defined as "a set of written, printed, or blank sheets bound together between a front and back cover." *Merriam-Webster Dictionary Online*, https://www.merriam-webster.com/dictionary/book (accessed Dec. 15, 2025) [https://perma.cc/76BT-L48N].

{¶ 27} Despite the fact that cookbooks are generally thought of as bound items rather than loose recipes in a file folder, the reference to "mother's cookbook" here is ambiguous. In the first place, most people have more than one cookbook, and the description fails to convey exactly which cookbook was intended. Furthermore, including the term "mother's" in

12

relation to the cookbook implies that the item in question may have a more personal meaning than a commercial cookbook. Therefore, the trial court was permitted to consider extrinsic evidence to determine the meaning. *United States Fid. & Guar. Co.*,129 Ohio App.3d at 55-56.

{¶ 28} Richard's testimony at the hearing was that his mother had kept handwritten recipes in an accordion folder. He made it clear that the recipes were very important to him because they were a connection to his mother, they could not be replaced, and he wanted to make the recipes exactly the way his mother had. According to Richard, Diane took the recipes to Boston after their mother died and said she would copy them and give the copies to Richard and Nancy. In addition, Diane had talked about wanting to publish the recipes for her own cookbook. Richard provided a list of 57 recipes he had seen in the folder and said there were at least 100 recipes. Tr. 43-45, 51, 68, 69, 78-80.

{¶ 29} Richard further indicated that Nancy's daughter Jennifer had sent him a video of copies of some handwritten recipes she had received from a cousin. Richard identified the recipes in the video as written in his mother's handwriting. Richard presented testimony from Jennifer, who stated that her grandmother had kept written recipes in a little accordion file. Jennifer said that she had her grandmother's banana bread recipe that Diane had sent her (on request), as well as photos of some handwritten recipes that Jennifer took when she was in college. Jennifer became aware of even more recipes when her second cousin Jill sent her a stack of them as a gift. Jennifer then sent the video to Richard about a month before the evidentiary hearing. *See* Tr. 46, 47, 70, 72, 94-97 (discussing the video of the recipes); Plaintiff's Ex. 24.3 (the video).

{¶ 30} On the other hand, Diane testified that she was not aware of an accordion file. She said she did not have the recipes in her possession that Richard had identified. Diane

13

further said that her mother had some loose recipes that were cutouts from newspapers and magazines. Diane said that she had thrown out those cutouts. According to Diane, her mother did not make these recipes; she just found them interesting and stuffed them in cookbooks and folders for future use. Diane explained that her mother would handwrite recipes if someone asked for them. However, Diane discarded those recipes when her mother's house was cleaned out. Thus, if the settlement had been based on those recipes, she would not have had any to give Richard. Tr. 123-125, 127-128. Diane did give Richard a cookbook of traditional Jewish recipes that she and her mother had both used for years. Richard denied this was the cookbook in question. Tr. 68-69, 121; Defendant's Ex. H.

{¶ 31} In its decision, the court found Richard and Jennifer highly credible and Diane "greatly lacking" in credibility concerning the recipes. Settlement Order, p. 1-2. The court therefore found that the accordion file existed and that instead of adhering to her fiduciary duties as a trustee, Diane placed Richard in the untenable position of bargaining for items that either did not exist or that Diane never intended to provide. Consequently, the court found fraud in the inducement of the Agreement. *Id*. at p. 4. The court also found that Diane had acted in bad faith and with malice and that she had violated her fiduciary duties. *Id*.

{¶ 32} While we review contract interpretation de novo, credibility decisions are a different matter. We defer substantially to fact-finders' decisions and to the weight they give witness testimony. *Buckeye Retirement Co., LLC v. Busch*, 2017-Ohio-4009, ¶ 55 (2d Dist.), citing *Bayes v. Dornon*, 2015-Ohio-3053, ¶ 54 (2d Dist.), and *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967). This is because fact-finders have the ability to see and hear witnesses; as a result, they have "'peculiar competence'" in assessing credibility. *Id*. at ¶ 56, quoting *State v. Lawson*, 1997 WL 476684, *4 (2d Dist. Aug. 22, 1997).

{¶ 33} "'A claim of fraud in the inducement arises when a party is induced to enter into an agreement through fraud or misrepresentation. . . . In order to prove fraud in the inducement, a plaintiff must prove that the defendant made a knowing, material misrepresentation with the intent of inducing the plaintiff's reliance, and that the plaintiff relied upon that misrepresentation to her detriment.'" *Dayton Children's Hosp. v. Garrett Day, LLC*, 2019-Ohio-4875, ¶ 103 (2d Dist.), quoting *ABM Farms, Inc. v. Woods*, 81 Ohio St.3d 498, 502 (1998). "'The fraud relates not to the nature or purport of the [contract], but to the facts inducing its execution . . . .'" *Miano v. Best*, 2017-Ohio-343, ¶ 26 (6th Dist.), quoting *Haller v. Borror Corp.*, 50 Ohio St.3d 10, 14 (1990).

{¶ 34} Justifiable reliance is a prima facie element of fraudulent inducement. *J.A. Industries, Inc. v. All Am. Plastics, Inc.*, 133 Ohio App.3d 76, 84 (3d Dist. 1999), citing *Countrymark Coop., Inc. v. Smith*, 124 Ohio App.3d 159, 171-172 (3d Dist. 1997). "'The question of justifiable reliance is one of fact and requires an inquiry into the relationship between the parties.'" *Amerifirst Savings Bank of Xenia v. Krug*, 136 Ohio App.3d 468, 495 (2d Dist. 1999), quoting *Crown Property Dev., Inc. v. Omega Oil Co.*, 113 Ohio App.3d 647, 657 (12th Dist. 1996). "The factors a court should consider include the nature of the transaction, the materiality of the representation or fact concealed, the parties' relationship, and their respective intelligence, experience, age, mental and physical condition, knowledge, and means of knowledge." *Fairbanks Mobile Wash, Inc. v. Hubbell*, 2009-Ohio-558, ¶ 26 (12th Dist.), citing *Finomore v. Epstein*, 18 Ohio App.3d 88, 90 (8th Dist. 1984).

{¶ 35} "Reliance is justified if the representation does not appear unreasonable on its face and if, under the circumstances, there is no apparent reason to doubt the veracity of the representation." *Crown Property* at 657, citing *Lepera v. Fuson*, 83 Ohio App.3d 17, 26 (1st Dist. 1992). Finally, "'[f]raudulent inducement must be proven by clear and convincing

15

evidence.'" *Dayton Children's Hosp.*, 2019-Ohio-4875, at ¶ 104 (2d Dist.), quoting *Simon Property Group, L.P. v. Kill*, 2010-Ohio-1492 (3d Dist.).

**{¶ 36}** Relative to fiduciary duty, under the Ohio Trust Code, "[u]pon acceptance of a trusteeship, the trustee shall administer the trust in good faith, in accordance with its terms and purposes and the interests of the beneficiaries, and in accordance with Chapters 5801. to 5811. of the Revised Code." R.C. 5808.01. Further, R.C. 5808.02(A) requires trustees to "administer the trust solely in the interests of the beneficiaries." And where "a trust has two or more beneficiaries, the trustee shall act impartially in investing, managing, and distributing the trust property, giving due regard to the beneficiaries' respective interests." R.C. 5808.03.

**{¶ 37}** "A trustee owes a fiduciary duty to the trust beneficiaries." *O'Neill v. O'Neill*, 2006-Ohio-6426, ¶ 8 (8th Dist.), citing *In re Tr. of Papuk*, 2002 WL 366519 (8th Dist. Mar. 7, 2002). "Fiduciary duty is defined as '[a] duty of utmost good faith, trust, confidence, and candor owed by a fiduciary . . . to the beneficiary . . . ; a duty to act with the highest degree of honesty and loyalty toward another person and in the best interests of the other person.'" *In re Testamentary Trust of Bernard*, 2008-Ohio-4338, ¶ 20 (9th Dist.), quoting *Black's Law Dictionary* (8th Ed. 2004). *Accord Dart v. Katz*, 2021-Ohio-1429, ¶ 69 (2d Dist.).

**{¶ 38}** In the context of fraudulent inducement, Richard produced evidence predating the litigation. This included events occurring immediately before his mother's death in 2020, such as the fact that other family members (Nancy, some cousins of Nancy's daughter, and Diane) were going through Beverly's things while she was dying and before Richard was present, and items, such as jewelry, were missing thereafter. Tr. 20, 83-85, 93-94, 98.

**{¶ 39}** The evidence also included other prelitigation events. After their mother's death, the siblings began the process by sharing some duties and dividing personal property among themselves. During that time, Richard received property that everyone agreed on.

16

However, things became contentious when Richard asked for certain property via text in August 2021. While Nancy said that was fine with her, Diane did not respond. Richard also told his sisters that they could have everything in the house; he only wanted his father's golf bag. Tr. 21-22, 30-34; Plaintiff's Exs. 7.2, 7.3, and 7.4. After that point, Diane was captured on a Ring camera video at their parents' house saying harsh things about Richard, including that she agreed about stalling the proceedings and that she absolutely wanted to make sure Richard had no access to personal property. Tr. 21-31, 73, 126, 129, 130; Plaintiff's Ex. 6 (a video from the Ring camera).

{¶ 40} We have reviewed the parts of the video submitted to the trial court. The taping on the Ring video (or at least the parts Richard presented at the hearing) occurred on September 23, 2021, shortly before the scheduled closing on the sale of Beverly's house. At that time, three people were present inside the house: Nancy, Diane, and Scott Sholiton, who was a family friend. Tr. 26-28; Plaintiff's Ex. 6. Richard was not present. Previously, the parties had installed the Ring video camera to provide security because they were not able to always be present at the house. All three siblings had access to the video feed. By September 23, the camera had been removed from the front door and had been taken inside the house. It happened to continue to tape, and Richard listened to the video feed live and downloaded the video. Tr. 21, 23, 26, 30-36.

{¶ 41} The context of the Ring video is that Richard had threatened to stop the closing on the property, demanding that funds from the closing be transmitted directly to him and that he receive the personal property he wanted. The context also is that the closing was going to occur soon, and the remaining contents needed to be removed from the house. We express no opinion on the truth of any statements; we simply note what is on the video.

{¶ 42} Based on the video's content, the matters in the excerpt labeled "27066" occurred first. At the beginning of this part of the video, Diane was attempting to call an attorney because she had received a letter from a beneficiary [Richard], things had spiraled out of control, she needed to reply the next day to the letter, and she needed to retain an attorney. At that point, Diane did not talk to the attorney; she talked to someone at his office and asked the attorney to call her that day if he could, because she needed to respond immediately. After the call ended, Scott told Diane that she did not need to do anything the next day, and that although it would be nice if she could, Richard could not give her such a short time to respond. He stated that Diane should "slow track" this whole thing, and Diane responded that she wanted to. Plaintiff's Ex. 6, 27066, 00:53–02:33.

{¶ 43} Scott owned a warehouse, to which the property remaining in the house was going to be taken due to the closing. Scott told Diane that he would contact someone to make sure not to answer the door (presumably to the warehouse). *Id.* at 02:47–03:08. From the discussion, Diane and Scott apparently believed Richard would come and try to take personal property. Nancy was silent during most of these video excerpts.

{¶ 44} During the rest of this part of the video, Scott told Diane that the funds would have to go into the estate and be disbursed when the estate was settled. Diane agreed. They also discussed the fact that Richard wanted all the items on his list. They noted that an email had been sent that Nancy had opened, but Diane would not open the email. The content of the email was unclear. Diane also said she was going to say that Richard had been threatening her. *Id.* at 03:19–06:32.

{¶ 45} In the second excerpt in Plaintiff's Ex. 6, the file labeled "83226," Diane stated that she was "through" with Richard when he started sending her abusive texts. *Id.* at 09:29–09:39. During this part of the video, as well as before, Diane also made comments of a more

18

personal nature, such as that she had taken joy in having embarrassed Richard, that she would call the police to remove him if he showed up at the house, that all Richard cared about was money, and so on. Again, we express no opinion on the truth of any statements other than that they were made.

{¶ 46} From viewing the video excerpts, it is clear that Diane was agitated and angry; and it is safe to say unpleasant feelings existed on both sides. However, the video vividly reveals that Diane was not acting in the position of a fiduciary, who would be neutral and act in the best interests of all beneficiaries, including Richard. Instead, she acted as an angry sibling who decided to act vindictively against a beneficiary. Notably, Diane was an attorney. Tr. 73. She would have known about fiduciary requirements and should have elected to have a neutral party appointed trustee when disagreements over property developed. She failed to do so.

{¶ 47} Diane would also have known that she was required to account to the beneficiaries. However, she failed to account for trust matters to the extent that Richard had to retain an attorney and file suit. Specifically, when Richard's attorneys wrote to Diane's counsel on December 12, 2021, and again on February 2, 2022, asking for an accounting and at least a partial property distribution, they received no response until February 22, 2022—several months after the closing on the house occurred. Furthermore, the account that was eventually produced in litigation in 2023 (the first Richard had received) reveals that Diane did not make a partial distribution on funds from the closing ($40,000 to each beneficiary) until April 24, 2025. At that time, Diane distributed to Nancy and herself; however, she did not send Richard's money until May 2, about a week later. Tr. 35-38; Plaintiff's Exs. 2.1, 2.2, 2.3, and 18.1. At that point (16 months after Beverly's death), no account had yet been provided. Richard then filed suit on May 26, 2022.

**{¶ 48}** In its decision, the trial court found that "in lieu of doing the right thing and upholding her fiduciary duty, [Diane] instead allowed a petty sibling rivalry to morph into bad faith and malice, in breach of her fiduciary duties of the utmost honesty, good faith, and disclosure. In short, she placed Richard Geisenfeld into the grossly unfair position of negotiating for items that either did not exist (and that she knew or should have known did not exist) <u>or</u> that she never intended at the time to provide." (Emphasis in original.) Settlement Order, p. 4.

**{¶ 49}** We agree. The Supreme Court of Ohio has said in the context of punitive damages that "actual malice" is "(1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm." *Preston v. Murty*, 32 Ohio St.3d 334 (1987), syllabus.

**{¶ 50}** Based on the testimony, it is impossible to believe that Diane was unaware of an accordion file containing her mother's handwritten recipes. To reach this conclusion would require ignoring the testimony of two other family members the trial court specifically found credible. As noted, we defer to credibility decisions of factfinders. For the reasons stated, the first assignment of error is without merit and is overruled.

### III. Award of Attorney Fees

**{¶ 51}** Diane's second assignment of error states:

> IN THE EVENT DIANE IS FOUND TO HAVE BREACHED THE SETTLEMENT AGREEMENT, THE TRIAL COURT ABUSED ITS DISCRETION IN AWARDING RICHARD HIS FULL ATTORNEYS' FEES AND COSTS.

20

{¶ 52} Under this assignment of error, Diane contends the trial abused its discretion in awarding Richard the full amount of attorney fees in the litigation. In this regard, Diane notes that Richard said in the Agreement that he would pay his own attorney fees. She further points out that the court acknowledged during the hearing that any attorney fees would be narrow because the case had many prongs, and the court, therefore, would be looking "'**only at the fees incurred and the very narrow auspices of enforcement of the settlement agreement**.'" (Emphasis in original.) Appellant's Brief, p. 17, quoting Tr. 154. Diane further argues the trial court erred in awarding punitive damages in the form of attorney fees rather than compensatory damages. Finally, Diane notes that in the Agreement, Richard released her from any attorney fees "'**except for claims arising out of or relating to this Settlement Agreement or related documents**.'" (Emphasis in original.) *Id*. at p. 19, quoting Agreement, p. 2. Accordingly, Diane contends the trial court went far beyond what could have potentially been awarded.

{¶ 53} In responding, Richard argues that the trial court found multiple instances of Diane's breach of fiduciary duty and that punitive damages may be awarded for such conduct if committed with actual malice. Richard suggests Diane's "malice" is shown by the Ring videos, where she said she was done with him. Appellee's Brief, p. 9-10. In addition, Richard contends that releases exculpating parties from future tortious conduct are either void or the liability in question must be specified in the release, not generally, as was done here. *Id*. at p. 10-11.

{¶ 54} In reply, Diane argues that while punitive damages can be awarded for breach of fiduciary duty and malice, the trial court could not have awarded punitive damages here upon awarding only nominal damages for Diane's failure to produce the handwritten recipes. Appellant's Reply Brief, p. 2-4. In response, Richard filed a motion to strike the brief or

21

disregard it because it raised a "new argument." Appellee's Motion to Strike Brief, p. 1-2. Both sides filed additional memoranda concerning the motion to strike.

{¶ 55} The law "is well settled that a party cannot 'use a reply brief to raise new issues.'" *Trotwood v. S. Cent. Constr., L.L.C.*, 2011-Ohio-237, ¶ 40 (2d Dist.), quoting *Ostendorf v. Montgomery Cty. Bd. of Commrs.*, 2004-Ohio-4520, ¶ 29 (2d Dist.). Our review reveals that Diane did not raise this issue in her initial brief, and we decline to consider it. Accordingly, the motion to strike the brief is sustained.

{¶ 56} Returning to the attorney fee decision, the trial court found, concerning the recipes, that they were "intentionally, recklessly, or with gross negligence destroyed, hidden, or disbursed to others by [Diane] or by others while they were in [Diane's] duty of safekeeping; that she knew or should have known that these were the items being requested by her brother; and she remained silent about the status of the handwritten recipes in the face of a duty to both inquire and disclose." (Emphasis in original.) Settlement Order, p. 4. Because the recipes were sentimental and not commercial items, the court awarded Richard nominal damages of $1,000 and also awarded him full litigation attorney fees and costs to penalize Diane for fraudulent inducement and breach of fiduciary duty. *Id*. at p. 4-5.

{¶ 57} Before addressing the issues, we note that Diane did not include the full context of the remarks the court made during the hearing. As indicated, the court gave the parties its preliminary conclusions and urged Diane to look in good faith for the recipes. Tr. 153-154. Though the court did indicate an intent to construe attorney fees narrowly, it also stressed that "depending on the good faith associated with that redoubling of efforts, the Court could decide the additional issues in the case, such as good faith and whether or not attorney fees should be awarded in whole or in part for some component of the case."

Tr. 154. Because the court's observations were preliminary, the court had the ability to change its mind.

{¶ 58} After the court allowed Diane to look further, Diane filed an affidavit, as noted, concerning her additional efforts to find recipes. Based on the court's findings on malice and its conclusion that Diane had "stooped to punking and gaslighting" her brother when she should have been acting as a fiduciary, the court clearly did not believe Diane made any good-faith effort despite being given a chance to do so. Settlement Order, p. 5.

{¶ 59} As an additional matter, while the parties agreed to pay their own attorney fees except for claims arising from the Agreement, the court found that the agreement had been fraudulently induced. As the court noted, if Richard had known of Diane's deception, he could have negotiated for different terms, including choosing to continue the litigation or obtaining more money or different property. *Id*. at p. 4. And contrary to Diane's claims, this appeal is not about whether she breached the agreement (she clearly did); it is about whether she did so maliciously and in breach of her fiduciary duties.

{¶ 60} Having made these observations, we turn to the legal standards that apply here.

A. Applicable Law

{¶ 61} "'Ohio has long adhered to the "American rule" with respect to recovery of attorney fees: a prevailing party in a civil action may not recover attorney fees as a part of the costs of litigation.'" *Cruz v. English Nanny & Governess School*, 2022-Ohio-3586, ¶ 35, quoting *Wilborn v. Bank One Corp*., 2009-Ohio-306, ¶ 7. "'The American Rule has roots in our common law reaching back to at least the 18th century.'" *Id*., quoting *Baker Botts, L.L.P. v. ASARCO, L.L.C*., 576 U.S. 121, 126 (2015). "The rationale behind the American rule is that because 'litigation is at best uncertain one should not be penalized for merely defending

23

or prosecuting a lawsuit, and that the poor might be unjustly discouraged from instituting actions to vindicate their rights if the penalty for losing included the fees of their opponents' counsel.'" *Id*., quoting *Fleischmann Distilling Corp. v. Maier Brewing Co*., 386 U.S. 714, 718 (1967).

{¶ 62} Nonetheless, three well-recognized exceptions to the rule exist: "(1) when a statute creates a duty to pay attorney fees, (2) when the losing party acted in bad faith, and (3) when the parties contracted to shift the fees." *Id*. at ¶ 36, citing *Wilborn* at ¶ 7. The second exception (involved here) "allows an award of attorney fees to the prevailing party as an element of compensatory damages when the jury finds that punitive damages are warranted." *Phoenix Lighting Group, L.L.C. v. Genlyte Thomas Group, L.L.C*., 2020-Ohio-1056, ¶ 9, citing *Zoppo v. Homestead Ins. Co*., 71 Ohio St.3d 552, 558 (1994). In this vein, the court noted in *Phoenix* that "'facts which justify the infliction of exemplary damages will also justify the jury in adding the amount of counsel fees to the verdict, not as a part of exemplary damages, but as compensatory damages.'" *Id*., quoting *New York, Chicago & St. Louis RR. Co. v. Grodek*, 127 Ohio St. 22, 25 (1933). This would be true as well when a court is the fact-finder.

{¶ 63} The statement in *Phoenix* is consistent with a very early case in which the Supreme Court of Ohio stated that

> In an action to recover damages for a tort which involves the ingredients of fraud, malice, or insult, a jury may go beyond the rule of mere compensation to the party aggrieved, and award exemplary or punitive damages; and this they may do, although the defendant may have been punished criminally for the same wrong.

. . . In such a case, the jury may, *in their estimate of compensatory damages*, take into consideration and include reasonable fees of counsel employed by the plaintiff in the prosecution of his action.

(Emphasis added.) *Roberts v. Mason*, 10 Ohio St. 277 (1859), paragraphs one and two of the syllabus. *Accord Cruz*, 2022-Ohio-3586, at ¶ 37. Again, the same observations would apply to judges operating as triers of fact.

{¶ 64} Trial court decisions on attorney fees are reviewed for abuse of discretion. *St. Elizabeth Med. Ctr.*, 129 Ohio App.3d at 58, citing *Motorists Mut. Ins. Co. v. Brandenburg*, 72 Ohio St.3d 157, 160 (1995). "'Abuse of discretion' has been defined as an attitude that is unreasonable, arbitrary or unconscionable." *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161 (1990), citing *Huffman v. Hair Surgeon, Inc.*, 19 Ohio St.3d 83, 87 (1985). "[M]ost instances of abuse of discretion will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary. . . . A decision is unreasonable if there is no sound reasoning process that would support that decision." *Id.*

{¶ 65} Punitive damages may also be awarded for breach of fiduciary duty given proof of implied or actual malice. *Schafer v. RMS Realty*, 138 Ohio App.3d 244, 301-302 (2d Dist. 2000) (discussing *Dunn v. Zimmerman*, 69 Ohio St.3d 304, 307 (1994)). As indicated, the malice "necessary for an award of punitive damages, is (1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm." *Preston*, 32 Ohio St.3d 334, at syllabus.

{¶ 66} The Supreme Court of Ohio has said that "it is rarely possible to prove actual malice otherwise than by conduct and surrounding circumstances. One who has committed

25

an act would scarcely admit that he was malicious about it, and so, necessarily, malice can be inferred from conduct." *Davis v. Tunison*, 168 Ohio St. 471, 475 (1959). "Moreover, actual malice can be inferred from conduct and surrounding circumstances which may be characterized as reckless, wanton, willful or gross." *Villella v. Waikem Motors, Inc.*, 45 Ohio St.3d 36, 37 (1989), citing *Columbus Finance, Inc. v. Howard*, 42 Ohio St.2d 178, 184 (1975), and *Rubeck v. Huffman*, 54 Ohio St.2d 20, 23 (1978).[2]

{¶ 67} Here, in addition to the findings on breach of fiduciary duty, the trial court stated that Diane had acted with "intentionally deceitful and malicious conduct." Settlement Order, p. 4. Consequently, and for the reasons already stated, the trial court had the ability to award attorney fees. As noted, this was not simply a breach of contract situation. It also involved malicious conduct and breach of fiduciary duties.

### B. Challenges to the Award

{¶ 68} In her brief, Diane argues that the attorney fee award resulted from the trial judge's passion and prejudice, which was evident "in her acknowledged understanding of 'the incredible sentimental value of the handwritten recipes,' which she indicated she had experienced in her own life." Appellant's Brief, p. 19-20, quoting Tr. 153. In *Villella*, the defendant made a similar claim; the jury awarded compensatory damages that consisted of $250 in actual damages and $15,000 in attorney fees, but it rendered a punitive damages award of $150,000. *Villella* at 39-40. The context of *Villella* was the alleged improper conduct of the plaintiff's attorney. *Id*.

---

2. *Villella* was modified on other grounds in *Moskovitz v. Mt. Sinai Med. Ctr.*, 69 Ohio St.3d 638 (1994). In *Moskovitz*, the court noted that "in prejudgment interest determinations pursuant to R.C. 1343.03(C), the phrase 'failed to make a good faith effort to settle' does not mean the same as 'bad faith'"; in contrast, *Villella* had interpreted the phrase to "'import a dishonest purpose, conscious wrongdoing or ill will in the nature of fraud.'" *Moskovitz* at 659, quoting *Villella*, 45 Ohio St.3d at 42. The case before us does not involve prejudgment interest.

**{¶ 69}** In considering the matter, the Supreme Court of Ohio remarked:

"[I]n order to determine whether excessive damages were so influenced [by passion or prejudice], a reviewing court should consider, not only the amount of damages returned and the disparity between the verdict and remittitur where one had been entered, but it becomes the duty of such court to ascertain whether the record discloses that the excessive damages were induced by . . . misconduct on the part of the court or counsel, or . . . by any other action occurring during the course of the trial which can reasonably be said to have swayed the jury in their determination of the amount of [punitive] damages that should be awarded."

*Villella*, 45 Ohio St.3d at 39, quoting *Fromson & Davis Co. v. Reider*, 127 Ohio St. 564 (1934), paragraph three of the syllabus. Thus, this standard applies to the conduct of both courts and attorneys. As a preliminary point, no misconduct occurred here.

**{¶ 70}** In considering whether the punitive damages were reasonably related to the actual damages in *Villella*, the Court noted that the defendant's "actual damages were $250 plus attorney fees." *Id.* at 40. This is similar to the current case, where the trial court awarded Richard "damages in the amount of $1,000 in nominal damages and Plaintiff's full attorney fees and costs of the litigation." Settlement Order, p. 4-5. Even though the court also classified the award as punishing Diane for her malicious conduct, it is clear that the award was intended both punitively and as compensation for the litigation costs that Diane's fraudulent acts caused Richard to incur.

**{¶ 71}** On the subject of nominal damages, the Supreme Court of Ohio made the following observations many years ago:

"According to the weight of authority, punitive damages may be recovered although the actual damages found are only nominal in amount. It is not always clear in what sense the term 'nominal damages' is used in this regard; that is, whether by it small actual damages or damages incapable of measurement are meant or whether it is used to designate the damages which follow in every case of violation of mere legal rights. If used in the latter sense, these cases go far toward destroying the practical effect of the general rule, making actual damages a necessary predicate for exemplary damages. If, however, the phrase 'nominal damages' is used in the sense of slight actual damages or actual damages incapable of ascertainment and award, a wide scope is left for the operation of the general rule. It will be recalled that the principal reason given in support of the general rule requiring actual damage as a predicate for the recovery of exemplary damages is that a private action cannot be maintained merely to inflict punishment upon the wrongdoer. [A] number of cases supporting the rule that a verdict for punitive damages may be supported even where the actual damages are merely nominal take the position that if a cause of action is made out which shows an infraction of a legal right, the cause is complete and may be maintained and exemplary damages may be recovered in proper cases despite the fact that the injury gives rise to no substantial pecuniary damage or to a loss incapable of exact measurement in money; in other words, that there is something to which exemplary damages may attach, small in amount though it may be. *See, also*, 13 Ohio Jurisprudence 243, Section 144; *Clark v. McClurg*, 215 Cal. 279, 9 P.2d 505, 81 A.L.R. 913; and 25 Corpus Juris Secundum, Damages, § 118, p. 713

*Richard v. Hunter*, 151 Ohio St. 185, 188-189 (1949), quoting 15 Am. Jur., § 270, at 706.

{¶ 72} In *Richard*, the Supreme Court used the term "actual" and nominal" damages interchangeably, the point being that simply because damages may be small or incapable of exact measurement, punitive damages may be awarded, because to hold otherwise would circumvent the reason for allowing such awards. For example, an action cannot be brought solely to obtain punitive damages. That is obvious and was not the case here; in fact, Richard was forced into litigation to try to obtain his property and an accounting based on Diane's alleged breach of fiduciary duties. Later, when the case was settled, Diane acted with malice and bad faith and violated her fiduciary duties.

{¶ 73} In *Villella*, the court remarked that "generally, the amount of punitive damages to be awarded rests largely within the determination of the trier of fact," and "the trial judge is in the best position to determine whether an award is so excessive as to be deemed a product of passion or prejudice." *Villella*, 45 Ohio St.3d at 40 (citing cases). The court further noted that "generally, it is not for a trial or appellate court to substitute its judgment for that of the trier of fact." *Id.*

{¶ 74} Diane has not contested the accuracy of the amount of fees incurred; her position is that the fees were excessive. We disagree and find no abuse of discretion. "'It is well settled that where a court is empowered to award attorney fees by statute, the amount of such fees is within the sound discretion of the trial court. Unless the amount of fees determined is so high or so low as to shock the conscience, an appellate court will not interfere.'" *Bittner v. Tri-Cty. Toyota, Inc.*, 58 Ohio St.3d 143, 146 (1991), quoting *Brooks v. Hurst Buick-Pontiac-Olds-GMC, Inc.*, 23 Ohio App.3d 85, 91 (12th Dist. 1985).

{¶ 75} Furthermore, another established point is that "Ohio courts have no firm rule on fee proportionality." *Chapel v. Wheeler Growth Co.*, 2023-Ohio-3988, ¶ 26 (1st Dist.).

"'A rule of proportionality would make it difficult, if not impossible, for individuals with meritorious . . . claims but relatively small potential damages to obtain redress from the courts.'" *Bittner* at 144, quoting *Riverside v. Rivera*, 477 U.S. 561, 578 (1986). *Accord Chapel* at ¶ 26.

**{¶ 76}** Here, the attorney fee award was substantial in proportion to the damages, but the record reveals that even before the case was filed, Diane engaged in acts that violated her fiduciary duties and required Richard to file suit to obtain an accounting and an appropriate distribution of property. When the case was settled, Diane's malicious actions continued, resulting in Richard's request for enforcement of the settlement agreement and claim that Diane had fraudulently induced the settlement. When Diane "redoubled" her efforts to find recipes, her actions were also done in bad faith, as the trial court clearly believed.

**{¶ 77}** In *Chapel,* the court mentioned various decisions where courts had upheld attorney fee awards that were significantly higher than the damages. *Id*. at ¶ 27. For example, courts have allowed awards where the fees were between 10 and 30 times the amount of the judgments. *Id*., citing *DiPenti v. Park Towers Condominium Assn*., 2020-Ohio-4277, ¶ 34 (10th Dist.), *Schultz v. Wurdlow*, 2012-Ohio-3163, ¶ 1, 25-26 (10th Dist.), *Alcorso v. Correll*, 2021-Ohio-3351, ¶ 21, 49 (8th Dist.), and *Christen v. Continental Ents.*, 2020-Ohio-3665, ¶ 52 (8th Dist.). This is not to say that such awards are automatically appropriate; the point simply is that courts have rejected "challenges to attorney's fees awards based purely on proportionality." *Chapel* at ¶ 27. Given Diane's actions, we find the attorney fee award was not an abuse of discretion. Instead, it was based on sound reasoning.

**{¶ 78}** Based on the preceding discussion, the second assignment of error is overruled.

30

## IV. Conclusion

{¶ 79} Both of Diane's assignments of error having been overruled, the judgment of the trial court is affirmed. In addition, Richard's motion to strike is sustained.

. . . . . . . . . . . . .

LEWIS, P.J., and HUFFMAN, J., concur.